**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**David E. LAWSON,**
**Defendant–Appellee.**

**No. 89–50623.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 6, 1990.

Decided Feb. 20, 1991.

Jeffrey C. Eglash, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellant.

Allan A. Sigel, Sigel & Boothe, Los Angeles, Cal., for defendant-appellee.

Before POOLE, HALL and THOMPSON, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

The United States appeals the district court's order dismissing for lack of jurisdiction the indictment against David Lawson for theft of government property in violation of 18 U.S.C. § 641. At issue in this case is whether the district court erred in deciding that the proceeds of auctioned property are not "government property" within the meaning of the statute. We have jurisdiction under 18 U.S.C. § 3731 and we affirm.

## I

David Lawson was an auctioneer who owned and operated Lawson & Lawson Auctioneers, Inc., a California corporation. Pursuant to an ongoing business relationship with the Small Business Administration (SBA), Lawson was hired to conduct five separate auctions to dispose of property and equipment from businesses that had defaulted on SBA guaranteed loans.

Besides his commissions and expenses, Lawson received approximately $256,000 in proceeds from the auctions that he failed to turn over to the SBA. Lawson later declared bankruptcy and the SBA was listed as a creditor. No objection was filed by the SBA in the bankruptcy proceedings and Lawson's debt to the SBA was discharged by the bankruptcy court.

On June 6, 1989 Lawson was indicted for five counts of theft of government property, in violation of 18 U.S.C. § 641.[1] Prior to trial, however, the district court entered an order ruling that the proceeds of the auctions were not government property and dismissed the indictment for lack of jurisdiction.

## II

■ An essential element of section 641 is that the property converted belong to the United States. *United States v. Long*, 706 F.2d 1044, 1048 (9th Cir.1983). Whether the proceeds are government property within the meaning of section 641 is a question of law, *United States v. Johnson*, 596 F.2d 842, 845 (9th Cir.1979), and is therefore reviewed de novo. *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

■ In determining the interest of the government in the proceeds we are guided by the principle of *United States v. Johnston* that if there were a bailment, then there could be a conversion, but if there were a debtor-creditor relationship, no conversion could occur. 268 U.S. 220, 226–27, 45 S.Ct. 496, 496–97, 69 L.Ed. 925 (1925). *See also United States v. Kristofic*, 847 F.2d 1295 (7th Cir.1988) (a person who is merely a debtor is not amenable to a claim of embezzlement or conversion.)

■ The SBA argues that it transferred only possession and not title of its property to Lawson, and thus remained the owner within the meaning of section 641. This argument misses the point. While it is true that the title to the original property never transferred to Lawson, this is not the property allegedly converted. Lawson had lawful possession of that original property, and its title lawfully transferred to the third party who bought it at auction. The property Lawson is accused of converting is the proceeds of the auction.

Upon sale of the property, payment was made to Lawson. Under section 5775(m) of the California Business and Professions Code,[2] Lawson had thirty working days after the sale before he was required to pay the seller the amount of the proceeds, less commission. During that time, although Lawson was required to keep the proceeds separate from his personal funds, Cal.Bus. and Prof.Code § 5775(n) (West Supp.1990), he could commingle the proceeds from all auctions. Section 5775 contains no requirement of separate trust accounts.

According to the SBA, Lawson converted the funds that he lawfully possessed through the sale of the government's property by "using the money ... to pay off

---

**1.** 18 U.S.C. § 641 provides, in relevant part: Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys, or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof ... [is liable under this section].

**2.** The contracts between the SBA and Lawson made no mention about who owned the pro-

ceeds. Two of the contracts, however, included the following provision: "Auctioneer agrees to conduct the sale and all activities connected therewith in a commercially reasonable manner, i.e., in accordance with those practices generally observed by the most highly respected local auction firms." As Lawson practiced in California and was licensed under California law, we examine whether California law imposed bailee status on Lawson.

other consignors of auctioned property, rather than to pay back the SBA." If this is correct, then Lawson had committed conversion long before the incidents in question. Lawson admits that it was his practice to "rob Peter to pay Paul," using the proceeds from more recent auctions in order to pay off older accounts before the end of the thirty-day period. But this was not a conversion; an auctioneer is not required to remit the actual proceeds from an auction. Instead, the auctioneer must remit *the amount* of the proceeds.

In certain contexts a consignee is liable for the actual proceeds of a sale. Under Cal. Civil Code § 1738.6 (West 1985), proceeds from the sale of consigned art are held in trust by the consignee for the consignor. Similarly, under Cal.Comm.Code § 2326(5) (West Supp.1990), any payment received by the consignee on a sale of goods used for personal, family or household purposes is the property of the consignor. Unlike these explicit statements regarding the consignor's interest, section 5775 of the Business and Professions Code is silent regarding proceeds. California law contains no provision that prevents an auctioneer from using the proceeds of one auction to pay off another, so long as the amount of the proceeds less commission is tendered within thirty days.

█ When a party is allowed to commingle funds and merely is required to pay the amount of net auction proceeds to the seller, his status is more properly seen as a debtor rather than a bailee. *See In re Walker Industrial Auctioneers, Inc.,* 38 B.R. 8 (Bkrtcy.D.Or.1983).[3] Unlike the situation prior to sale, where Lawson was responsible for the actual pieces of property that he held for the SBA, after the auction Lawson could use money from any source, so long as he paid the proper amount.

In deciding that it lacked jurisdiction, the district court looked to the relevant sections of the California Commercial Code. Code sections 2326 and 9114, which govern the rights of parties to consignments, make no provision regarding the proceeds of the sale of consigned goods. This omission is explained in comment 1 to section 9114:

> Except in the limited cases of identifiable cash proceeds received on or before delivery of the goods to a buyer, no attempt has been made to provide rules as to perfection of a claim to proceeds of consignments (compare section 9–306) or the priority thereof (compare section 9–312). It is believed that under many true consignments the consignor acquires a claim for an agreed amount against the consignee at the moment of sale, and does not look to the proceeds of sale. In contrast to the assumption of this Article [Article 9] that rights to proceeds of security interests under section 9–306 represent the presumed intent of the parties (compare 9–203(3)), the Article goes on the assumption that if consignors intend to claim the proceeds of sale, they will do so by expressly contracting for them and will perfect their security interests therein.

Cal.Comm.Code § 9114 (West 1990) (comment 1). This commentary makes clear that the normal practice in California is for consignors to look merely to the amount of the proceeds, unless they specifically contract to look to the proceeds themselves.

The SBA puts forth several arguments why the commentary to section 9114 should not be applied. First, it argues that the Uniform Commercial Code, from which section 9114 is taken, should not be used to determine the government's rights under 18 U.S.C. § 641. According to the SBA, in section 641 Congress sought to reach a wide variety of conduct involving interferences with the government's property rights. "[M]inor nuances in the law of commercial transactions" should not be allowed to conflict with the "broad remedial purpose" underlying section 641.

---

**3.** In *Walker* the debtor was able to commingle auction funds into its general account. But we do not believe Lawson's inability to place the funds in his personal account is significant. Lawson was able to apply the funds from one auction towards his debts from other auctions. Just as in *Walker,* Lawson was merely obligated to pay the amount of the net auction proceeds, rather than the actual proceeds collected.

This argument is in direct conflict with this circuit's conclusions in *United States v. Long* that government ownership of the property in question must be proved in order to have a valid cause of action under section 641 and that we may use the U.C.C. to clarify ambiguities. 706 F.2d at 1048–49. Congress may have sought to reach a broad range of conduct, but the issue in this case is not Lawson's conduct; it is whether any government property rights were implicated. In addition, Congress has sought to make the provisions of the Bankruptcy Code, through which Lawson's debts were discharged, broad as well. *See In re Walker*, 38 B.R. at 12 (noting the broad definitions of "creditor" and "claim" under the bankruptcy code). Thus, the court's use of a statute based upon the U.C.C. to hold that this was a debtor/creditor relationship governed by the bankruptcy code was not contrary to the intent of Congress.

Second, the SBA argues that this commentary is inapplicable since section 9114 applies only to security interests. It points to Cal.Comm.Code § 1201(37) which states that "[u]nless a consignment is intended as security, reservation of title thereunder is not a 'security interest' ..." As the government correctly notes, there is no evidence that the parties intended to create a security interest. Rather than a security interest, the auction contract was a "true" consignment. *See In re Ide Jewelry Co., Inc.*, 75 B.R. 969, 977–78 (Bkrtcy.S.D.N.Y.1987) (describing the distinction between a security interest and a "true" consignment).

Although not entirely clear, the SBA appears to be correct that section 9114 applies only to consignments designed for security. *See* Cal.Comm.Code § 9102 (West 1990). But the commentary is not so limited. It specifically states, "It is believed that under many *true consignments* the consignor acquires a claim for the agreed amount ... and does not look to the proceeds of the sale." Cal.Comm.Code § 9114 (West 1990) (comment 1) (emphasis added). The commentary applies to the contract between Lawson and the SBA.

Finally, the SBA's argument that it satisfied the requirements of section 2326(3)(b) misses the mark. As the government acknowledges, section 2326 applies to the property being sold on consignment—it is silent regarding the proceeds of such sales. The only statement regarding proceeds is section 9114's commentary.

Applying the commentary, we conclude that the government could look only to the agreed amount since the contracts failed to state that the proceeds belong to the government. Instead, the contracts merely required Lawson to "promptly" remit net sales proceeds to the SBA. Although Lawson did maintain a separate account for the proceeds, this was not required by the contracts. The district court was correct in concluding that a debtor/creditor relationship existed and dismissing the case for lack of jurisdiction.

The SBA argues that this produces the anomalous result of making Lawson potentially liable for conversion only until he actually sells the property. Lawson was still liable as a debtor, however, and in the future if the government wishes to claim the actual proceeds, it need only contract for that right.

AFFIRMED.