# MYSTIC COLOR LAB, INC. *v.* AUCTIONS WORLDWIDE, LLC, ET AL.
## (SC 17838)

Rogers, C. J., and Borden, Palmer, Vertefeuille and Zarella, Js.*

---

* The listing of justices reflects their seniority status as of the date of oral argument.

Argued May 18—officially released November 20, 2007

*Walter Weir, Jr.*, pro hac vice, with whom were *William E. Murray* and, on the brief, *Jason M. Reiser*, pro hac vice, for the appellants (defendants).

*Thomas J. Riley*, with whom, on the brief, was *Kristen D. DeCato*, for the appellee (substitute plaintiff Valora AG).

*Opinion*

ZARELLA, J. In this matter involving an auctioneer's alleged conversion and statutory theft for failure to remit the proceeds of an auction to the seller, the defendants, Auctions Worldwide, LLC (Auctions Worldwide)

and A. David Loeser, Jr.,[1] appeal[2] from the trial court's judgment in favor of the plaintiff, Mystic Color Lab, Inc. (Mystic).[3] The defendants claim that the trial court improperly (1) concluded that the defendants were liable in tort for the conversion of proceeds from an auction of Mystic's photo processing equipment, (2) concluded that the defendants were liable for statutory theft of the auction proceeds under General Statutes § 52-564 and, thus, improperly awarded treble damages to Mystic, and (3) failed to apply the economic loss doctrine to the common-law conversion claim, which would have precluded recovery for purely economic loss. Mystic claims that the trial court properly concluded that the auction proceeds belong to Mystic and that Auctions Worldwide was responsible for safeguarding those proceeds. We agree with the defendants as to the claims for conversion and statutory theft and, therefore, need not determine the applicability of the economic loss doctrine. Accordingly, we reverse in part the judgment of the trial court.

The facts of the case are largely undisputed. On March 12, 2003, Mystic, a Connecticut corporation, executed a written commission sale agreement (agreement) with

[1] Edward E. Lord, the former controller of Auctions Worldwide, initially was named as a defendant in this action. The trial court subsequently granted Lord's motion to dismiss the claims against him and the motion of the plaintiff, Mystic Color Lab, Inc., to add Loeser as a party defendant. We refer to Auctions Worldwide and Loeser collectively as the defendants.

[2] The defendants appealed to the Appellate Court from the judgment of the trial court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[3] Since commencement of this action, Mystic has been dissolved and has assigned its assets, including its interest in this litigation, to its sole shareholder, Fotolabo USA. Subsequent to the dissolution of Mystic, Fotolabo USA was dissolved and assigned its assets to its sole shareholder, Valora AG. On March 6, 2006, the court, *Hurley, J.*, granted the motion of Valora AG to be substituted as the plaintiff. In the interest of consistency, we refer to Mystic as the party defending this appeal even though Valora AG technically is the appellee.

Auctions Worldwide, a Delaware corporation, to sell certain photo processing equipment that Mystic had used in the course of its business. The purpose of the agreement was defined in ¶ 1, which provides that "[t]he [s]eller [Mystic] hereby hires [Auctions Worldwide] as [its] exclusive agent, to sell the [a]ssets from the date of signing this [a]greement to sixty . . . days after the auction is conducted . . . . [Auctions Worldwide] in [its] sole discretion shall determine whether the [a]ssets are to be sold by private sale or at a public auction . . . ." Pursuant to ¶ 15, the parties agreed that Connecticut law would govern the agreement and that "[i]t is understood that [Auctions Worldwide] is merely an independent contractor retained by [Mystic] and not acting as an agent of [Mystic]."

The agreement further provided under ¶ 2, entitled "[c]ommission," that "[p]roceeds from the sale of the [a]ssets shall be paid directly to [Auctions Worldwide]." Mystic specifically agreed to "reimburse [Auctions Worldwide] up to the amount of [$29,500] for labor, advertising, and marketing expenses . . . based on actual costs incurred." In addition, the agreement provided that Auctions Worldwide "reserve[d] the right to charge a [10 percent] [b]uyer's [p]remium payable to [Auctions Worldwide] and [would] rebate [10 percent] of the [b]uyer's premium to [Mystic]." The agreement also stated that Auctions Worldwide would deliver all proceeds due to Mystic "[w]ithin fifteen . . . business days following the auction . . . and each Friday after this period . . . as collected and cleared . . . ." The proceeds due to Mystic would be "less [Auctions Worldwide's] [a]uction [e]xpenses, commission, and other amounts due [Auctions Worldwide]." Auctions Worldwide agreed to deliver the proceeds to Mystic, "together with a preliminary accounting thereof" and a "final accounting report," within sixty business days of the date of the auction. The agreement was silent, however,

with respect to any requirements or restrictions regarding Auctions Worldwide's handling of the funds prior to the time for remittance of the amount due to Mystic.

Pursuant to the agreement, Auctions Worldwide conducted the auction at Mystic's place of business on May 1, 2003. The photo processing equipment remained on Mystic's premises after the agreement was executed until the auction buyers took possession after the sale. The amount due to Mystic following the auction, less Auctions Worldwide's expenses and commission, was $310,847.89.[4] Upon receipt of the auction proceeds, Auctions Worldwide deposited the funds into its general operating account, where they were commingled with "funds from purchases of other auctions as well as other [money] belonging to Auctions Worldwide." According to testimony at trial, it was standard practice for Auctions Worldwide to deposit all auction proceeds that it received in its general operating account. Auctions Worldwide did not deliver the final accounting or the proceeds due to Mystic within the time period on which Mystic and Auctions Worldwide had agreed.

Thereafter, Mystic demanded payment of the proceeds. Although Auctions Worldwide acknowledged that it owed money to Mystic, it made no payment until May, 2004. After the time for payment under the agreement had expired, and in response to Mystic's demands, the defendants, beginning sometime in the fall of 2003, attempted to resolve the debt by proposing various repayment plans, which Mystic rejected. Each proposal called for an initial lump sum payment, to be immediately followed by subsequent payments subject

---

[4] The record does not reflect the total sale proceeds from the auction of Mystic's equipment but, rather, the amount due to Mystic less the amount owed to Auctions Worldwide for expenses and commission.

to various terms.[5] In response, Mystic's attorney contacted Auctions Worldwide's controller and demanded that any funds available for immediate payment be wired to Mystic. At no time during the negotiations, however, did Auctions Worldwide transfer funds to Mystic. As of the filing of this appeal, Auctions Worldwide's payments to Mystic totaled $42,940.22. These funds were paid in two checks dated May and June, 2004, respectively.

Following the May, 2003 auction, Auctions Worldwide used the funds in its general operating account to satisfy numerous financial obligations of the company. These included obligations incurred by other related companies[6] owned by Loeser for employees' salaries, rent and utilities. At the time of trial, Auctions Worldwide still existed as a legal entity but no longer was operational, having become insolvent without making any additional payments to Mystic.

Mystic filed this civil action in January, 2004, alleging claims against Auctions Worldwide for breach of contract and claims against both Auctions Worldwide and Loeser for common-law conversion, statutory theft under § 52-564 and violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. Thereafter, the defendants conceded that they owed Mystic a balance of $267,907.67. By agreement between the parties, the CUTPA claim was withdrawn.

---

[5] Copies of mail and electronic mail communications show that, on November 25 and December 2, 2003, Auctions Worldwide offered Mystic a lump sum of $88,068, payable immediately, followed by eighteen monthly payments. On February 26, 2004, Auctions Worldwide's attorney renewed an offer to settle the dispute and proposed an immediate lump sum payment of $50,000, followed by subsequent payments at 6 percent interest over thirty months. On March 25, 2004, Auctions Worldwide's attorney made another similar offer.

[6] The record indicates that Loeser is the sole shareholder of ADL Global, Inc., which, according to his testimony, "owns" Auctions Worldwide and ADL Express. Testimony as to the organizational structure and relationship of these three businesses is unclear in the record.

At the conclusion of the trial, the court issued a memorandum of decision. In determining liability for conversion and statutory theft, the court found that Mystic had a "right to the proceeds beginning fifteen days after the auction. All the proceeds were due within sixty days and certainly by the end of . . . 2003." The court also found that "the evidence at trial clearly proves that the money held by [Auctions Worldwide] belonged to [Mystic] . . . ." According to the trial court, Auction Worldwide's "retaining possession of the proceeds," coupled with its use of the funds collected to pay other financial obligations, constituted the "unauthorized act" required for conversion. In concluding that Loeser should be held personally liable, the court found that, as the managing director of Auctions Worldwide, he "wrongfully used his authority and responsibility to divert or direct the diversion of funds owed to [Mystic] . . . ." The court also found that Loeser "derive[d] a personal benefit from the conversion of the [Mystic] funds in that significant amounts were paid to . . . other companies owned and operated by Loeser . . . [and] by satisfying financial obligations other than the obligation owed to [Mystic], Loeser was able to avoid personal liability on certain obligations and to maintain the viability of all three companies . . . ."[7] The court noted that, once it had found conversion, a finding of liability for statutory theft required proof of the additional element of "intent to deprive another of his property . . . ." The court found that Loeser had the requisite intent by virtue of his failure to "safeguard" the funds from the auction and his diversion of those "funds to his own companies," knowing that such a diversion would mean that Auctions Worldwide "would not be able to satisfy its obligations to [Mystic]." On the basis

[7] The plaintiff introduced evidence that money from Auctions Worldwide's operating account was transferred to ADL Global, Inc., at Loeser's direction, and was used to fund employee paychecks. See footnote 6 of this opinion.

of these findings, the court rendered judgment for Mystic in the amount of $803,723.01, plus statutory interest on the conversion and statutory theft claims. The judgment[8] consisted of treble damages in accordance with § 52-564.[9] This appeal followed.

I

Before we consider the merits of the appeal, we address the threshold issue of whether the relationship between an auctioneer and a seller of goods is fiduciary in nature, thus giving rise to an obligation on the part of the auctioneer to "safeguard" the auction proceeds. Mystic urges this court to conclude, as a matter of public policy, that auctioneers act as agents of sellers, that they have a common-law duty to hold proceeds in trust for the benefit of the seller and that a failure to do so creates liability for theft. The record presented, however, does not permit us to reach this issue. Mystic never alleged in its pleadings that the parties had either a fiduciary or an agency relationship. Moreover, Mystic presented no evidence from which the trial court reasonably could have found that the special trust or confidence characteristic of a fiduciary relationship existed between the parties in the present case.[10] Both Mystic

---

[8] The trial court implicitly found in favor of Mystic on its breach of contract claim in noting in its memorandum of decision that the defendants conceded to the amount owed under the contract. Furthermore, the trial court used the amount owed under the contract, i.e., $267,907.67, as the basis for damages in computing the treble damages award.

[9] General Statutes § 52-564 provides: "Any person who steals any property of another, or knowingly receives and conceals stolen property, shall pay the owner treble his damages."

[10] It is well settled that "a fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other." (Internal quotation marks omitted.) *Konover Development Corp.* v. *Zeller*, 228 Conn. 206, 219, 635 A.2d 798 (1994); see also *Alaimo* v. *Royer*, 188 Conn. 36, 41, 448 A.2d 207 (1982); *Harper* v. *Adametz*, 142 Conn. 218, 225, 113 A.2d 136 (1955). When assessing whether a dependent or special trust relationship exists between parties, we have noted factors to consider, such as whether one party had superior

and Auctions Worldwide were business entities, and no evidence was offered to suggest that Mystic was incapable of negotiating terms that would allocate the risks involved in the transaction. We especially note the absence of any evidence in the record regarding the customary practices of auctioneers in Connecticut, the industry standards that govern the use of written contracts by auctioneers in forming agreements with sellers and the norms within the profession for the handling of funds collected by auctioneers following an auction sale. Indeed, Mystic notes that the trial court made no findings regarding the normal practices of the auction industry or the existence of a fiduciary relationship. Although Mystic, in its posttrial memorandum, encouraged the trial court to adopt the position taken by the New York Supreme Court in *Edwards* v. *Horsemen's Sales Co.*, 148 Misc. 2d 212, 214, 560 N.Y.S.2d 165 (1989), that an auctioneer has a fiduciary duty to remit the proceeds of the sale to the seller and that the auctioneer is personally liable for its failure to do so, Mystic did not introduce evidence of a fiduciary relationship at trial. We therefore decline to decide whether there are circumstances in which an auctioneer-seller relationship may give rise to a fiduciary duty on the part of the auctioneer to the seller.[11]

knowledge or skill, whether one party undertook to act primarily for the benefit of the other, and whether the plaintiff was lacking in mental acuity, business intelligence or knowledge of the basic principles involved. *Hi-Ho Tower, Inc.* v. *Com-Tronics, Inc.*, 255 Conn. 20, 41–42, 761 A.2d 1268 (2000), citing *High Plains Genetics Research, Inc.* v. *J K Mill-Iron Ranch*, 535 N.W. 2d 839, 842–43 (S.D. 1995).

[11] Our refusal to address Mystic's argument, which it raises for the first time on appeal, that an auctioneer owes a duty to the seller as a matter of law to segregate auction proceeds, comports with the well established rule that we generally decline to "review an issue that has not been properly raised before the trial court." *Bell Atlantic Mobile, Inc.* v. *Dept. of Public Utility Control*, 253 Conn. 453, 485, 753 A.2d 361 (2000); see also Practice Book § 60-5 ("[t]he court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial"); *Santopietro* v. *New Haven*, 239 Conn. 207, 219–20, 682 A.2d 106 (1996) (court not required to consider claim not properly preserved in trial court).

## II

We now turn to the defendants' claims that the trial court improperly found the defendants liable for common-law conversion and for statutory theft under § 52-564, which requires a determination that the parties have a bailor-bailee relationship. The defendants claim that the relationship between Mystic and Auctions Worldwide is most properly viewed as that of a debtor and creditor, rather than a bailor and bailee, because the auction proceeds did not constitute property that belonged to Mystic, proof of which is necessary to establish liability for conversion and statutory theft. Mystic responds that (1) it had a right to possess the proceeds, and, therefore, the proceeds were properly regarded as its property, (2) Auctions Worldwide exceeded its contractual authority in handling the proceeds when it failed to remit the funds to Mystic and instead used them to satisfy its own financial obligations, and (3) Auctions Worldwide had an obligation to safeguard the funds for Mystic. We agree with the defendants.[12]

Mystic's brief summarizes the question before us as follows: "[D]id [the] [d]efendants merely owe Mystic a

[12] The defendants also contend that the trial court did not find, "by clear and convincing evidence," that Mystic had proven the required element of intent for statutory theft under § 52-564. Mystic argues that the usual civil standard of a fair preponderance of the evidence applies to claims brought under § 52-564 and, further, that the defendants' failure to move for articulation of the standard in the trial court precludes them from raising the issue on appeal. Because we conclude that the relationship between Auctions Worldwide and Mystic was that of a debtor and creditor, the claims for conversion and statutory theft are not viable as a matter of law. Thus, we need not decide whether a party must prove statutory theft under § 52-564 by clear and convincing evidence and whether a party must move for articulation when the trial court's memorandum of decision is silent as to the standard that the court applied, in order to preserve the issue for appeal. Cf. *Howard* v. *MacDonald*, 270 Conn. 111, 130, 851 A.2d 1142 (2004) (declining to address issue as to requisite standard of proof under § 52-564 because, even under heightened standard, jury reasonably could have found that defendant committed statutory theft).

debt, or did the proceeds belong to Mystic?" Whether the proceeds of the auction constituted property that belonged to Mystic is a question of law subject to our plenary review. See, e.g., *Hope* v. *Cavallo*, 163 Conn. 576, 579, 316 A.2d 407 (1972) (issue of ownership of motor vehicle is question of law).[13] We acknowledge that there is no Connecticut precedent directly on point with respect to the contractual duty of an auctioneer to remit auction proceeds to a seller. We therefore begin our analysis with a brief review of the law on conversion and statutory theft.

Conversion is an unauthorized assumption and exercise of the right of ownership over property belonging to another, to the exclusion of the owner's rights. E.g., *Deming* v. *Nationwide Mutual Ins. Co.*, 279 Conn. 745, 770, 905 A.2d 623 (2006); *Hi-Ho Tower, Inc.* v. *Com-Tronics, Inc.*, 255 Conn. 20, 43, 761 A.2d 1268 (2000); *Devitt* v. *Manulik*, 176 Conn. 657, 660, 410 A.2d 465 (1979). Similarly, statutory theft is the stealing of another's property or the knowing receipt and concealment of stolen property. See General Statutes § 52-564 ("[a]ny person who steals any property of another, or knowingly receives and conceals stolen property, shall pay the owner treble his damages").[14] Statutory theft, how-

---

[13] Mystic argues that the element of intent required for statutory theft is a question of fact that should be subject to the clearly erroneous standard of review. Because we conclude that statutory theft was not possible, as a matter of law, in light of our determination that the parties' relationship is most appropriately viewed as that of a debtor and creditor, we need not address Mystic's argument with respect to the appropriate standard of review.

[14] This court has held that statutory theft under § 52-564 "is synonymous with [the crime of] larceny" as defined in General Statutes § 53a-119. (Internal quotation marks omitted.) *Hi-Ho Tower, Inc.* v. *Com-Tronics, Inc.*, supra, 255 Conn. 44, quoting *Suarez-Negrete* v. *Trotta*, 47 Conn. App. 517, 520, 705 A.2d 215 (1998). A person commits larceny within the meaning of General Statutes § 53a-119 "when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner." An "owner" is defined, for purposes of § 53a-119, as "any person who has a right to possession

ever, requires an element over and above what is necessary to prove conversion, namely, that the defendant intentionally deprived the complaining party of his or her property. *Suarez-Negrete* v. *Trotta*, 47 Conn. App. 517, 521, 705 A.2d 215 (1998). Nonetheless, to prevail on either claim, the party alleging conversion or statutory theft must prove a sufficient property interest in the items in question. See *Falker* v. *Samperi*, 190 Conn. 412, 419–20, 461 A.2d 681 (1983) (plaintiff's property rights are at heart of conversion, and proof of ownership is plaintiff's burden); *Discover Leasing, Inc.* v. *Murphy*, 33 Conn. App. 303, 309, 635 A.2d 843 (1993) (prima facie case for conversion and statutory theft requires proof that property in question "belonged to" plaintiff). Accordingly, a claim for conversion may be brought when the relationship is one of bailor and bailee but not when it is one of debtor and creditor. See *United States* v. *Johnston*, 268 U.S. 220, 226–27, 45 S. Ct. 496, 69 L. Ed. 925 (1925).

A debtor-creditor relationship arises from a debt owed by one party to another. The debt owed arises from an obligation, often contractual, on the part of the debtor, not from a preexisting property interest of the creditor. See Black's Law Dictionary (6th Ed. 1990) (defining debt as "[a] sum of money due by certain and express agreement" and "[a] specified sum of money owing to one person from another, including not only obligation of debtor to pay but right of creditor to receive and enforce payment"). In contrast, "[a] relationship of bailor-bailee arises when the owner, while retaining general title, delivers personal property to another for some particular purpose upon an express or implied contract to redeliver the goods when the purpose has been fulfilled, or to otherwise deal with the goods according to the bailor's directions. . . . In

---

superior to that of a taker, obtainer or withholder." General Statutes § 53a-118 (5).

bailment, the owner or bailor has a general property [interest] in the goods bailed . . . . The bailee, on the other hand, has mere possession of items left in its care pursuant to the bailment." (Citations omitted; internal quotation marks omitted). *B. A. Ballou & Co.* v. *City-trust*, 218 Conn. 749, 753, 591 A.2d 126 (1991). A bailment therefore contemplates redelivery of goods entrusted to the bailee, whereas a debtor-creditor relationship contemplates the payment of an obligation defined by agreement between the parties.

Furthermore, a bailment may not exist when the goods entrusted to a party properly are intermingled or commingled with goods belonging to others. See id., 753–56 (bailment cannot exist when property is properly commingled or combined with property owned by others). In *B. A. Ballou & Co.*, the plaintiff could not prevail on its claim of conversion when no bailment could be shown. Id., 756. In that case, we specifically concluded that, "[b]ecause [the recipient of the plaintiff's scrap metal (recipient)] commingled the scrap metal and had it remanufactured by a third party who mixed it with new metal as needed, there was no way of determining whether any of the same scrap sent to [the recipient] by [the plaintiff] ever returned to [the plaintiff] as finished brass." Id., 751. If the purported bailee is not bound to return the same items that were delivered to him by the bailor, but may deliver any other item or items of equal value, there is no bailment. See id., 755; cf. 2 Restatement (Second), Agency § 398, comment (c) (1958) (when there is commingling of funds, auctioneer-seller relationship should be viewed as that of debtor and creditor).

The defendants concede that, if the proceeds from an auction are treated as a bailment, they constitute property that belongs to Mystic, and, therefore, actions in violation of the bailment relationship may give rise to claims for conversion and statutory theft. Cf. *John-*

*ston* v. *United States*, supra, 268 U.S. 226–27. The analysis of a possible claim for conversion or theft when the subject of the claim is an obligation to pay money that is owed, however, results in a different conclusion. Although our case law is clear that a claim for money, not just tangible goods, may be the subject of conversion or statutory theft, a claim for money owed on a debt is not sufficient to establish such causes of action. E.g., *Deming* v. *Nationwide Mutual Ins. Co.*, supra, 279 Conn. 772; see also *Bridgeport Harbour Place I, LLC* v. *Ganim*, Superior Court, judicial district of Waterbury, Complex Litigation Docket, Docket No. CV-040184523-S (February 16, 2006) (40 Conn. L. Rptr. 764) ("no Connecticut case holds that money owed by a debtor is the property of the creditor and allows for a cause of action in statutory theft when the debt is not paid" [internal quotation marks omitted]). Moreover, in order to establish a valid claim of conversion or statutory theft for money owed, a party must show ownership or the right to possess specific, identifiable money, rather than the right to the payment of money generally. See *Deming* v. *Nationwide Mutual Ins. Co.*, supra, 772; see also *Macomber* v. *Travelers Property & Casualty Corp.*, 261 Conn. 620, 650, 804 A.2d 180 (2002) ("[a] plaintiff must establish legal ownership or right to possession in the particular thing, the specifically identifiable moneys, that the defendant is alleged to have converted" [internal quotation marks omitted]). In *Deming*, we observed that "[a] mere obligation to pay money may not be enforced by a conversion action . . . ." *Deming* v. *Nationwide Mutual Ins. Co.*, supra, 772; see also *Macomber* v. *Travelers Property & Casualty Corp.*, supra, 650. When an action arises from a claim under an express or implied contract, a claim in tort is inappropriate. *Deming* v. *Nationwide Mutual Ins. Co.*, supra, 772; see also *Macomber* v. *Travelers Property & Casualty Corp.*, supra, 651 (comparing

claim for money to claim for specific chattel and noting similar requirement that funds at issue be specifically identifiable).

Courts from other jurisdictions that have examined the auctioneer-seller relationship when an auctioneer fails to remit proceeds also suggest that, in the absence of the segregation of auction proceeds, the relationship should be viewed as that of a debtor and creditor. See, e.g., *In re Rine & Rine Auctioneers, Inc.*, 74 F.3d 848, 853 (8th Cir. 1996); *United States* v. *Lawson*, 925 F.2d 1207, 1210 (9th Cir. 1991); *In re Farrell & Howard Auctioneers, Inc.*, 172 B.R. 712, 716 (Bankr. D. Mass. 1994); *In re Walker Industrial Auctioneers, Inc.*, 38 B.R. 8, 12–13 (Bankr. D. Or. 1983). For example, the Eighth Circuit Court of Appeals, in *In re Rine & Rine Auctioneers, Inc.*, rejected the determination of the lower court that the auctioneer and the seller were in an agency relationship and held that the seller was a creditor of the auctioneer's bankruptcy estate, even though the auctioneer withheld the auction proceeds from the seller. See *In re Rine & Rine Auctioneers, Inc.*, supra, 853–54. The commingling of the proceeds with other funds was integral to the Eighth Circuit's determination that the auction proceeds were not the property of the seller. See id., 853. The court observed that, although "the auction proceeds were segregated from [the auctioneer's] general funds . . . they were nevertheless deposited in an account where they were intermingled with the funds of other auction customers and lacked any indicia of [the seller's] ownership." Id. The Eighth Circuit also considered the seller's claim that the auction proceeds were held in a trust that had been created as a result of the auctioneer's oral representations that it would segregate the auction proceeds. In rejecting this claim, the court stated: "[T]here is no basis to conclude that the parties manifested an intent to create such a trust." Id.

Similar results were reached in *In re Walker Industrial Auctioneers, Inc.*, and *In re Farrell & Howard Auctioneers, Inc.* Both cases involved a claim of a preferential transfer in a bankruptcy proceeding and required the court to determine whether the seller was a creditor of the auctioneer's bankruptcy estate. See *In re Farrell & Howard Auctioneers, Inc.*, supra, 172 B.R. 715–16; *In re Walker Industrial Auctioneers, Inc.*, supra, 38 B.R. 9, 12. The auctioneer-seller relationship in each case was governed by a written agreement calling for the auctioneer to collect the proceeds of the auction sale and to remit the amount due to the seller, following a deduction for the auctioneer's commission and ex-penses, within a certain time period. *In re Farrell & Howard Auctioneers, Inc.*, supra, 713; *In re Walker Industrial Auctioneers, Inc.*, supra, 12. In concluding that the seller was a creditor, each court relied on the contract between the parties and on the absence of any provision requiring the auctioneer to segregate the auction proceeds for the seller. See *In re Farrell & Howard Auctioneers, Inc.*, supra, 715–16; *In re Walker Industrial Auctioneers, Inc.*, supra, 12–13.

In *United States* v. *Lawson*, supra, 925 F.2d 1209–11, the Ninth Circuit Court of Appeals likewise held the auctioneer-seller relationship to be that of a debtor and creditor in California, where an auctioneer is permitted to commingle funds from multiple auctions.[15] In that case, the auctioneer was charged with theft of government property under 18 U.S.C. § 641. The government's argument was that the auctioneer's failure to remit the proceeds of an auction of property belonging to the Small Business Administration (seller) amounted to

[15] California law provided that, although an auctioneer could not commingle auction proceeds with the funds of a general operating account, it was permitted to commingle the proceeds with those of other auctions and to use proceeds from one auction to satisfy money owed to a seller from another auction as long as the proceeds less commission would be tendered within thirty days. *United States* v. *Lawson*, supra, 925 F.2d 1209–10.

theft of that property. See id., 1209–10. Determination of the validity of the claim rested on whether the seller was an owner of the proceeds such that the auctioneer could be held liable for theft. See id. The court found that the property belonged to the auctioneer and that the seller's claim was for money owed as a creditor. See id., 1210–11. The court concluded: "[T]he contracts [between the seller and the auctioneer] failed to state that the proceeds belong to the [seller]. Instead, the contracts merely required [the auctioneer] to 'promptly' remit net sales proceeds to the [seller]. Although [the auctioneer] did maintain a separate account for the proceeds, this was not required by the contracts. The [D]istrict [C]ourt was correct in concluding that a debtor/creditor relationship existed . . . ." Id., 1211.

Secondary authority also characterizes the auctioneer-seller relationship as that of a debtor and creditor when the commingling of funds occurs. See, e.g., 7 Am. Jur. 2d 422, Auctions and Auctioneers § 80 (1997) ("It has been said that an auctioneer may properly commingle his funds with those of his principal . . . . [When] the auctioneer is permitted to commingle funds, his status toward the principal with regard to the money he receives is more properly viewed as that of a debtor than of a bailee."); see also 2 Restatement (Second), supra, § 398, comment (c). These sources further suggest that an auctioneer's commingling of auction proceeds with funds from other auctions or other sources is not abnormal and does not constitute misconduct on the part of the auctioneer. 2 Restatement (Second), supra, § 398, comment (c) ("In the case of certain professional agents, such as auctioneers and factors, it is customary, and hence ordinarily understood, that the agent can properly mingle his funds with those of his principal. . . . If the funds are properly mingled, the

inference is that the agent becomes a debtor to the amount received for the principal . . . .").[16]

With these principles in mind, we now review the parties' agreement in the present case. In determining whether the relationship was in the nature of a bailment or that of a creditor and debtor, we must ascertain the parties' intent. As in any contractual relationship, we first examine the language used in the agreement. E.g., *Connecticut Light & Power Co.* v. *Lighthouse Landings, Inc.*, 279 Conn. 90, 109, 900 A.2d 1242 (2006) ("[t]he intent of the parties as expressed in a contract is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction" [internal quotation marks omitted]). If the intention of the parties is not clear, we may look to the customs of the industry as understood by the parties when they entered into the agreement. See *Presidential Capital Corp.* v. *Reale*, 231 Conn. 500, 511, 652 A.2d 489 (1994) ("custom and usage of the trade can supplement or qualify an agreement" if each party knows or has reason to know of that usage), citing 2 Restatement (Second), Contracts § 221 (1981).

Keeping in mind that Mystic's claim is that the proceeds from the sale of its equipment are the subject of the alleged bailment, rather than the items themselves, we conclude that it is clear from the agreement's language that Auctions Worldwide was not charged with the responsibility of delivering the auction proceeds to Mystic. The agreement provided that any proceeds from the sale would be "paid directly" to Auctions Worldwide

[16] The Restatement (Second) of Agency provides a relevant illustration: "P employs A, an auctioneer, who, after the sale of P's goods, collects the amount due, receiving a check therefor from the debtor. A deposits the check to his own account in the bank. It may be found that A has committed no breach of duty to the principal." 2 Restatement (Second), supra, § 398, comment (c), illustration (2).

by the buyer. The agreement further provided that Auctions Worldwide would collect and clear the receipts, thus indicating that Auctions Worldwide would be required to deposit the auction proceeds in a bank account. Auctions Worldwide was not required to hold the proceeds in trust or in a special account designated for Mystic. Nor did the agreement prohibit Auctions Worldwide from depositing the funds into its general operating account. Moreover, the agreement permitted Auctions Worldwide to deduct from the proceeds of the auction its expenses and fees before remitting the amount "due" to Mystic. Finally, Auctions Worldwide was not required to remit any amount "due" until fifteen days following the sale. Thus, although the agreement is not dispositive, its provisions do not suggest that the parties intended to create a bailor-bailee relationship.

In addition, no evidence was adduced at trial regarding the parties' understanding of the customs and practice of the industry, other than that Auctions Worldwide handled all of the other auction proceeds collected in the course of its business in a similar fashion. We therefore conclude that Auctions Worldwide was not in a bailor-bailee relationship with Mystic. Under the facts presented, it was impossible for a bailment of the auction proceeds to exist between Mystic and Auctions Worldwide. At the time of the auction, the money ultimately used to purchase Mystic's equipment was in the possession of third party buyers and thus was not the property of Mystic. It was the buyers, not Mystic, who delivered the auction proceeds to Auctions Worldwide, which received them pursuant to the terms of the agreement. Furthermore, the auction proceeds represented not only consideration for the sale of the plaintiff's photo processing equipment but also money owed to Auctions Worldwide for the expenses of the auction and its commission. Mystic retained no security interest in the proceeds, and, under the terms of the agreement,

Auctions Worldwide had the exclusive right to the auction proceeds for fifteen days after the auction, had the freedom to use the funds during the fifteen day period for its own use and was under no contractual obligation to segregate the auction proceeds from funds in its general account.[17] The intermingling of the proceeds with Auctions Worldwide's general operating funds also rendered them unidentifiable and untraceable, which further defeats a claim that a bailment could have existed. See *B. A. Ballou & Co.* v. *Citytrust,* supra, 218 Conn. 754.

We therefore conclude that the relationship between the parties was that of a debtor and creditor. Auctions Worldwide had a contractual obligation to pay to Mystic the amount due under the agreement within the time period established by the agreement. The circumstances in the present case are analogous to those of *In re Rine & Rine Auctioneers, Inc.,* supra, 74 F.3d 848, *United States* v. *Lawson,* supra, 925 F.2d 1207, *In re Farrell & Howard Auctioneers, Inc.,* supra, 172 B.R. 712, and *In re Walker Industrial Auctioneers, Inc.,* supra, 38 B.R. 8.[18] As in *In re Farrell & Howard Auction-*

---

[17] At oral argument, Mystic conceded that it had no right to demand payment of the auction proceeds until fifteen days after the auction pursuant to the parties' agreement.

[18] Mystic argues that reliance on bankruptcy cases to demonstrate a debtor-creditor relationship is misplaced in view of the bankruptcy courts' policy of treating all creditors with claims to a bankruptcy estate equally. We find this argument unpersuasive. Rather, bankruptcy courts use state law to determine the nature and extent of a debtor's property. E.g., *In re Rine & Rine Auctioneers, Inc.,* supra, 74 F.3d 851 (holding that Nebraska state law governs issue of "whether an agency relationship existed" between auctioneer and seller for purpose of reviewing bankruptcy court's decision to grant seller's request for auction proceeds that bankrupt auctioneer failed to remit). Furthermore, Mystic suggests that these bankruptcy opinions "did not consider the rights and responsibilities arising as a matter of law out of the principal-auctioneer relationship." We disagree and observe that the courts in *In re Farrell & Howard Auctioneers, Inc.,* and *In re Walker Industrial Auctioneers, Inc.,* addressed whether an agency relationship was implied by virtue of the auctioneer-seller relationship and chose to rely exclusively on the written agreements between the parties and their handling

*eers, Inc.*, supra, 713, and *In re Walker Industrial Auctioneers, Inc.*, supra, 12, the parties' agreement in the present case contained no language requiring segregation of the auction proceeds or any provision requiring that Auctions Worldwide hold the auction proceeds in trust or for the benefit of Mystic.[19] During the fifteen day period following the auction, Auctions Worldwide had complete control over the funds. The parties' agreement contained no provision limiting how the funds could be used or directed during that fifteen day period. Furthermore, there is no evidence in the record, nor did either party plead, that there was any intent to form a trust with regard to the auction proceeds or any language in the agreement suggesting that Auctions

---

of the funds in question. See *In re Farrell & Howard Auctioneers, Inc.*, supra, 172 B.R. 716 ("The wording of the contract, as well as the [auctioneer's] actions, are conclusive on ownership of the sales proceeds. The contract imposed no obligation to segregate the proceeds or hold them in trust. It merely required the [auctioneer] to pay the [seller] the net proceeds, less commission, within fourteen business days following the auction. . . . All of this, particularly the agreement's terms, establishes that the parties' relationship following the auction was that of debtor and creditor rather than trustee and beneficiary."); *In re Walker Industrial Auctioneers, Inc.*, supra, 38 B.R. 12–13 (Declining to comment on whether the relationship between the auctioneer and the seller should be characterized as that of principal and agent because, even if it was, "it would be impossible for [the seller] to trace the agency property [i.e., the sale proceeds] . . . . [When] a principal permits commingling by its agent, the relationship between the parties with respect to proceeds is a simple debtor-creditor relationship rather than one of actual trust." [Citations omitted.]).

[19] We also note that the court in *In re Farrell & Howard Auctioneers, Inc.*, supra, 172 B.R. 717, relied on *In re Morales Travel Agency*, 667 F.2d 1069 (1st Cir. 1981). In *In re Morales Travel Agency*, an airline claimed that it was the owner of the proceeds from a bankrupt travel agency's ticket sales. Id., 1071. The court found a debtor-creditor relationship between the travel agency and the airline. Id. The court observed that there was no requirement that the "[ticket] proceeds [be held in an account] separate from other funds [of the travel agency] . . . ." Id. The court also observed that it was the travel agency's practice to commingle all its funds in one account. Id., 1074. The lack of control that the airline had over the funds from the ticket sales was an indicator that the money owed by the travel agency was a debt, and, therefore, the airline did not have a property interest in those funds.

Worldwide would receive the proceeds "on behalf of" Mystic. See, e.g., *In re Rine & Rine Auctioneers, Inc.*, supra, 853. We therefore conclude that Mystic's claims for conversion and statutory theft must fail, in keeping with our precedent barring such claims for money owed. See *Deming* v. *Nationwide Mutual Ins. Co.*, supra, 279 Conn. 772–73. Accordingly, the trial court incorrectly determined that the auction proceeds belonged to Mystic and improperly rendered judgment in favor of Mystic on its claims of conversion and statutory theft.[20]

The judgment is reversed as to the counts of Mystic's complaint alleging common-law conversion and statutory theft and the case is remanded with direction to render judgment for the defendants with respect to those counts; the judgment is affirmed in all other respects.[21]

In this opinion the other justices concurred.

---

[20] Mystic argues that the auction proceeds should be viewed as the functional equivalent of the photo processing equipment and that the failure of Auctions Worldwide to remit proceeds is no different than if it had stolen the photo processing equipment to be auctioned. The plaintiff offers no case law in support of such an analogy. In rejecting this argument, we rely on our conclusion that the agreement and conduct of the parties created a debtor-creditor relationship.

[21] Consequently, we affirm that part of the trial court's judgment rendered in favor of Mystic on the breach of contract claim in the amount of $267,907.67 plus prejudgment interest. See footnote 8 of this opinion.