# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 09-2250

———————

| | | |
|---|---|---|
| Bremer Bank, National Association, a national banking association, | * * * | |
| Plaintiff - Appellant, | * * | |
| v. | * * | Appeal from the United States District Court for the |
| John Hancock Life Insurance Company, a Massachusetts corporation; U.S. Bank, National Association, a national banking association, | * * * * * | District of Minnesota. |
| Defendants - Appellees. | * | |

———————

Submitted: March 10, 2010
Filed: April 13, 2010

———————

Before RILEY, Chief Judge,[1] JOHN R. GIBSON and MURPHY, Circuit Judges.

———————

MURPHY, Circuit Judge.

Appellant Bremer Bank (Bremer), the owner of an aircraft leased to and operated by Northwest Airlines Corporation (NWA), brought this action against John Hancock Life Insurance Company (Hancock), which represented a majority interest

———————

[1]The Honorable William Jay Riley became Chief Judge of the United States Court of Appeals for the Eighth Circuit on April 1, 2010.

in the loan that furnished eighty percent of the purchase price of the aircraft, and U.S. Bank (USB). Bremer alleges that in the aftermath of NWA's bankruptcy filing, its equity in the aircraft and lease were improperly extinguished by USB, acting on Hancock's instructions. The district court[2] granted summary judgment to Hancock and USB and denied Bremer's motion for summary judgment on its contract claims. Bremer appeals. We affirm.

## I.

The subject aircraft, a Boeing 757-251 bearing U.S. Registration number N526US, was purchased over twenty years ago through a leveraged lease transaction shaping the parties' rights and obligations to each other. NWA, the lessee, is the only original participant in the transaction; the others changed over the years as interests were sold and divided. During the period relevant to this dispute, Bremer was the owner participant. The original owner participant acquired the aircraft in the name of a trust of which it was the sole beneficiary. The trust was managed by an owner trustee representing the owner participant's interests. The original owner participant paid twenty percent of the aircraft's purchase price and directed the original owner trustee to borrow the balance from an original loan participant, whose interest in the trust estate was represented by an indenture trustee and whose loan was evidenced by secured certificates. The secured certificates were refinanced, enabling others to obtain them and become loan participants as well.

During the relevant period here, Hancock was a loan participant, though not the only one. Hancock had a majority interest of certificate holders which enabled it to issue binding instructions to the indenture trustee regarding the exercise of remedies in the event of a default. The original owner trustee leased the aircraft to NWA and

---

[2]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

assigned the lease to the original indenture trustee, which was granted a first priority secured interest in the aircraft and lease. USB was both the owner trustee and the indenture trustee during the period relevant to this case.

NWA submitted lease payments to USB, which first distributed payments to the secured certificate holders in repayment of the debt, and then if funds remained to itself in its capacity as owner trustee. The secured certificate holders' debt was nonrecourse as to Bremer, the owner participant. Hancock and the other secured certificate holders' debt was secured exclusively by the lease and by the aircraft itself. Bremer received the tax benefits of ownership. See 1 Ian Shrank & Arnold G. Gough, Jr., Equipment Leasing–Leveraged Leasing 2-20-25 (4th ed. 2009) (explaining mechanics of leveraged equipment leasing).

Several documents, including the indenture, memorialize the transaction (the operative documents). The indenture is the agreement between the owner trustee (USB) and the indenture trustee (also USB). It includes § 4.04(a), a so called "equity squeeze" clause regarding the exercise of remedies following a default:

> If an [indenture] Event of Default shall have occurred and be continuing . . . the Indenture Trustee may exercise any or all of the rights and powers and pursue any and all of the remedies pursuant to this Article IV and, as a precondition thereto, in the event there shall have occurred and be continuing [any lease Event of Default], shall declare the Lease to be in default and concurrently exercise, as appropriate, any and all of the remedies pursuant to Section 15 of the Lease[.]

Section 15 of the lease states that upon the occurrence of an event of default, the lessor may declare the lease to be in default and then take possession of the aircraft, "sell, hold, operate, use, or lease the aircraft[,]" demand certain payments, rescind the lease, or "exercise any other right or remedy which may be available to it[.]"

On September 14, 2005, NWA filed for bankruptcy protection under 11 U.S.C. § 1101 et seq. The filing was an event of default as defined by the indenture and the lease. NWA was willing to continue operating the aircraft only under a lease with more favorable terms. On October 18, 2005, the bankruptcy court granted it permission to reject the lease without further court order and gave NWA forty five days to negotiate revised lease terms. One of Bremer's officers admitted in an e-mail message on October 27, 2005 that "[Hancock] know[s] we have no equity[,]" an acknowledgment that in light of NWA's bankruptcy the value of the aircraft no longer exceeded the balance of the secured debt. According to Hancock and USB, Bremer expressed no interest in negotiating with NWA, so Hancock moved to protect its own investment and restructure the lease.

NWA was entitled to a stay as to its aircraft leases after filing for bankruptcy. 11 U.S.C. § 362. There is a special exception to a § 362 stay for aircraft financiers, 11 U.S.C. § 1110, which compelled NWA either to cure the lease default or turn over possession of the aircraft to its creditors within sixty days of its bankruptcy filing. NWA and indenture trustee USB, acting on Hancock's instructions representing the lenders' interests, extended the stay through a series of stipulations pursuant to 11 U.S.C. § 1110(b). The stipulations, which were renewed several times to extend the stay through May 2006, included an agreement by NWA to pay a reduced monthly payment to USB as indenture trustee. Bremer agreed to the terms of the 1110(b) stipulations.

On March 2, 2006, NWA filed a motion requesting court approval of its rejection of the old lease and acceptance of a new lease. The new lease term sheet included an unsecured claim against NWA's estate of fifteen million dollars for lease rejection damages payable to USB as indenture trustee. It also included reduced monthly lease payments. Bremer objected to the motion in bankruptcy court. At the March 28, 2006 hearing on NWA's motion and Bremer's objection, Bremer agreed with the bankruptcy court's statement that there were two ways its concerns could be

addressed: either the indenture trustee could establish the commercial reasonableness of the proposed term sheet, thus addressing Bremer's contrary contention, or it could foreclose on Bremer's interest, rendering its objection moot. The hearing was adjourned explicitly to give Hancock and USB sufficient time to complete a foreclosure sale to extinguish Bremer's interest.

Later that same day, USB, as indenture trustee acting at Hancock's direction, served a notice of acceleration and public sale of collateral which accelerated the payment of the secured certificates under the indenture and set May 2, 2006 as the date for a public auction for the trust estate. Bremer filed a complaint and temporary restraining order application in district court on April 24, 2006 to prevent the foreclosure sale, but the court denied the application and allowed the sale to proceed. USB advertised the sale in several trade publications and sold the indenture estate to a third party for $100,000 more than the credit bid of $12, 450, 093.26. Bremer did not attend the sale, nor did it bid for the indenture estate or purchase the secured debt from the certificate holders. USB, as owner trustee, transferred the trust indenture estate to the third party. The bankruptcy court granted NWA's motion and approved the term sheet on May 18, 2006.

Bremer argues that the actions of Hancock and USB following NWA's bankruptcy, culminating in the May 2, 2006 foreclosure sale, breached the "equity squeeze" provision of § 4.04(a) of the indenture. It brought breach of contract and related claims against Hancock and USB in its capacity as indenture trustee. As indenture trustee, USB was indemnified for acting on Hancock's instructions. All parties moved for summary judgment.

The district court granted summary judgment to Hancock and USB and denied summary judgment to Bremer on the contract claims. The district court found no breach of the indenture or the implied covenant of good faith and fair dealing. It also concluded that the foreclosure sale was conducted in a commercially reasonable

manner. In addition, the court granted summary judgment to Bremer on Hancock's counterclaim for indemnification of legal fees and expenses. Bremer does not challenge the district court's determination on the implied covenant of good faith and fair dealing or its conclusion that the foreclosure sale was commercially reasonable. Bremer argues, however, that the district court erred in finding no breach of contract based on its interpretation of the operative documents.

## II.

We review de novo a summary judgment as well as a district court's interpretation of a contract. Transcon. Ins. Co. v. W.G. Samuels Co., 370 F.3d 755, 757 (8th Cir. 2004). Summary judgment is appropriate if, viewing the evidence in the light most favorable to the nonmoving party, there is no material factual dispute. Fed.R.Civ.P. 56(c). The parties agree that the construction of the operative documents is governed by New York law. Under New York law, a plaintiff proves breach of contract by showing an agreement, adequate performance of the contract, breach, and damages. Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996). Bremer argues that USB, acting on Hancock's instructions, breached the indenture (a) by failing to declare a default; (b) by not exercising lease remedies prior to exercising indenture remedies; and (c) by not exercising lease remedies at all. We will consider each argument in turn.

The operative documents require that the indenture trustee declare the lease to be in default before exercising remedies under the indenture or lease. Bremer first alleges that appellees breached the indenture because USB never declared a default. An "event of default" under both the lease and the indenture occurred when NWA filed for bankruptcy protection and obtained authority from the bankruptcy court to reject the lease. Bremer contends that NWA's bankruptcy default was waived under the new lease term sheet. That document excluded the commencement of NWA's pending bankruptcy as an "event of default" under the new lease. Otherwise, since the

new lease was to be signed while NWA was still in bankruptcy proceedings, NWA would have been in default the moment it signed the new lease. That provision, however, did not affect the definition of "event of default" under the existing lease. In addition, NWA's failure to make payments required by the lease after its bankruptcy filing was another continuing event of default. Bremer representatives acknowledged that a default had occurred during the March 28, 2006 bankruptcy proceeding, in deposition testimony, and in a proof of claim submitted to the bankruptcy court. Identifying the occurrence of an event of default was not necessarily a declaration of a default, however, as USB made clear in its communications announcing events of default.

USB sent out three similar notices informing the relevant parties that an event of default had occurred and was continuing. The first two notices, sent in October and November 2005, stated in part: "Please be advised that nothing herein shall constitute or be deemed to constitute a declaration by the Trustee that the Lease is in default." Hancock and USB do not claim that the first two notices were declarations of default.

By contrast, the third notice, sent in March 2006, stated:

You have previously received notice that an Event of Default has occurred and is continuing under Section 4.02(a) of the Indenture as a result of a Lease Event of Default[.] . . .
**The Indenture Trustee hereby declares all unpaid Principal Amount of [and unpaid interest on] all Secured Certificates currently outstanding . . . to be immediately due and payable.**
**The Indenture Trustee hereby further notifies you that the Indenture Trustee intends to sell the Owner Trustee's right, title and interest in the Aircraft, the Lease and all other property, interests or rights pledged by the Owner Trustee to the Indenture Trustee under the Indenture by public auction sale**[.] . . .

This notice is delivered to you in accordance with Sections 4.03 and 4.04 of the Indenture, [and] Section 15 of the Lease[.] (Emphasis in original.)

Under § 4.04(d) of the indenture, a declaration of default would automatically trigger Bremer's obligation to repay immediately all secured certificates under the indenture and enable the indenture trustee to sell the trust estate at public auction. Especially when viewed in light of the previous notices which had explicit disclaimers, the March acceleration notice could have left no doubt that USB was declaring a default and exercising its remedies accordingly.

According to Bremer, the plain meaning of the word "declare" required USB to make an "explicit, formal and emphatic statement" that the lease was in default. "Declare" can also mean "to make clearly known" or "to show or reveal[.]" Webster's New World Dictionary 358 (3d College Ed. 1988). As the district court concluded, nothing in the operative documents required the indenture trustee to "employ any specific language, such as, 'the Indenture Trustee hereby declares the Lease to be in default[.]'" Bremer Bank, Nat. Ass'n v. John Hancock Life Ins. Co., No. 06-1534, 2009 WL 702009, at *5 (D.Minn. Mar. 13, 2009). The lease only required a declaration "by written notice[.]"

The Fifth Circuit case cited by Bremer, L & A Contracting Co. v. S. Concrete Servs., Inc., 17 F.3d 106 (5th Cir. 1994), is not to the contrary. In that case, a contractor sought to collect on a performance bond from a subcontractor's surety but did not use the word "default" in its notices or clarify whether the subcontractor's deficiencies amounted to a material breach justifying a default. Id. at 110-111. Here by contrast, USB unambiguously declared that events of default had occurred and then emphatically stated it was exercising remedies for which a default declaration was a condition precedent. Moreover, the Fifth Circuit did not require that the contractor use the word "declare" in its declaration of default in a construction surety context but that it use "clear, direct, and unequivocal language." Id. at 111. The contractor only

-8-

need "inform the surety that the principal has committed a material breach[,] . . . that the obligee regards the subcontract as terminated, and that the surety must immediately commence performing under the terms of its bond." Id. In short, a declaration must inform its recipients that a breach occurred and what will or must happen as a result. The March acceleration notice did so, and in boldface type. To require more would elevate form over substance.

Bremer also argues that by extending the protections of the § 362 stay, the § 1110(b) stipulations prohibited USB from declaring a default. These stipulations did not explicitly prohibit the indenture trustee or lessor from declaring a default. On the contrary, they explicitly reserved all rights under the operative documents except as provided by the stipulations. The § 362 automatic stay is intended to protect the bankrupt lessee, NWA, not the owner participant. Here, the § 362 stay worked as Congress intended, giving NWA "a breathing spell from [its] creditors" to permit it time "to attempt a repayment or reorganization plan[.]" In re NextWave Personal Commc'ns. Inc., 244 B.R. 253, 266 n.6 (Bkrtcy.S.D.N.Y. 2000) (quoting H.R.Rep. No. 595, 95th Cong., 1st Sess. 340 (1977)). NWA fully consented to and benefitted from the foreclosure sale and new lease, which represented the culmination of negotiations between NWA and appellees. Concluding that the sale was forbidden by the § 362 stay would undermine the goal of that provision. Cf. In re Delta Air Lines, Inc., 313 Fed.Appx. 430, 434 n.2 (2d Cir. 2009) (unpublished) (noting that a similar leveraged lease of an aircraft could be restructured after the lessee airline's bankruptcy with either "[the owner participant's] consent *or foreclosure of [its] interests*") (emphasis supplied). Moreover, if Hancock and USB were required to obtain relief from the § 362 stay, such relief was implicitly granted by the bankruptcy court when it continued the March 28, 2006 hearing to enable them to execute a foreclosure sale.

Bremer next alleges that even if USB properly declared a default, it nonetheless violated the "equity squeeze" provision of the indenture. Stripped of extraneous wording, § 4.04(a) reads: *If an indenture event of default occurs, the indenture trustee*

*may exercise § 4 indenture remedies and, as a precondition thereto, if there is a continuing event of default under the lease, shall declare the lease to be in default and concurrently exercise § 15 lease remedies.* Bremer reads § 4.04 as requiring the concurrent declaration of default and the exercise of § 15 remedies, as a precondition to the exercise of § 4 remedies. The other parties interpret it to require that they first declare a default, and then concurrently exercise § 15 and § 4 remedies.

Bremer's interpretation contradicts § 15 of the lease, which requires a written declaration of default prior to, not concurrently with, the exercise of remedies. Moreover, equity squeeze provisions in leveraged equipment leases typically provide for the concurrent exercise of indenture and lease remedies. See 3 Shrank & Gough, supra, 29-72. Bremer offers nothing to support its interpretation other than the "plain" language of the sentence, which the district court relied on to reach the opposite conclusion. Where, as here, "the evidence presented about the parties' intended meaning [is] so one-sided that no reasonable person could decide the contrary[,]" a court may resolve ambiguity in contractual language as a matter of law. Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 232 F.3d 153, 158 (2d Cir. 2000) (quotation omitted). We read § 4 the same as appellees and the district court. Even Bremer previously held this view, stating in its bankruptcy court objection that § 4.04 "requires that, as a 'precondition' to the Indenture Trustee's exercise of any right or remedy against the Indenture Trust Estate, the Indenture Trustee concurrently exercise its rights and remedies under the Lease against [NWA.]"

Bremer also argues that USB did not exercise any § 15 lease remedies. Its first two subarguments, that USB could not have exercised lease remedies because it failed to declare a default and because the § 362 stay prohibited it from doing so, have already been addressed. The district court accepted Hancock and USB's argument that the following actions taken by USB were remedies under § 15 of the lease: a) entering into the § 1110(b) stipulations; b) negotiating new lease terms with NWA; c) pursuing

and receiving an unsecured claim for fifteen million dollars in rejection damages against NWA's estate; d) serving the acceleration notices, and e) conducting the foreclosure sale. Section 15 of the lease utilizes broad language, permitting the lessor to "do one or more of the following . . . in its sole discretion[,]" including the exercise of "any other right or remedy which may be available to it under applicable law[.]" Bremer considers USB's actions to have been indenture remedies, but the fifteen million dollar lease rejection damages claim was a remedy arising exclusively out of the lease. Given § 15's expansive language, it is reasonable to consider as a remedy the § 1110(b) stipulations requiring NWA to maintain the aircraft and to make monthly payments despite the § 362 stay.

In addition, § 15 explicitly lists selling the aircraft as a remedy. See In re Delta Air Lines, Inc., No. 05-17923, 2007 WL 2932774, at *6 (Bkrtcy.S.D.N.Y. Oct. 5, 2007) (assessing, in a similar aircraft leveraged lease transaction, whether lease remedies had been exercised and concluding that "[i]f the aircraft had been sold [by the indenture trustee at a public auction], the [lease] remedy clearly would have been exercised"), rev'd on other grounds sub nom. Lone Star Air Partners, LLC v. Delta Air Lines, Inc., 387 B.R. 426 (S.D.N.Y. 2008).[3] Bremer's allegation that this foreclosure sale was entirely a § 4 indenture remedy against it is unfounded given that the sale included a fifteen million dollar lease rejection claim against NWA.

---

[3]The district court cited Lone Star for the proposition that some of USB's actions leading to the foreclosure sale, such as the negotiation of the term sheet, were also an exercise of lease remedies. In an unpublished summary order, the Second Circuit subsequently vacated Lone Star and remanded for an evidentiary hearing on the meaning of the phrase "'attributable to the exercise of a remedy'" where a foreclosure sale had not resulted in a transfer of title. See Delta Air Lines, 313 Fed.Appx. at 435. The bankruptcy court's conclusion in that case that a consummated sale by the indenture trustee would have "clearly" constituted a lease remedy was undisturbed.

Bremer's assertion to the contrary, the § 1110(b) stipulations did not prohibit USB from exercising § 15 remedies.  The stipulations state that they do not affect the parties' rights and claims under the bankruptcy code and operative documents "except as expressly set forth" in the stipulations.  Bremer points to a paragraph stating that if NWA defaults under the stipulations it may be subject to remedies under the bankruptcy code and operative documents, but this paragraph does not preclude, expressly or impliedly, the exercise of lease remedies without a breach of the stipulations.  In addition, the stipulations require NWA to make the aircraft available to prospective purchasers, an indication that the parties anticipated the possibility of a planned foreclosure while the stipulations were in effect.

Finally, Bremer asserts that since NWA continued to use the aircraft, the rejection was a de facto modification of the existing lease requiring Bremer's consent.  This position is undermined by the record.  NWA sought and received permission from the bankruptcy court to reject the lease, it agreed to a claim for lease rejection damages, and after the trust estate was sold NWA entered into a new lease with the highest bidder at the foreclosure sale, not with any party to this case.

## III.

Since we conclude that Hancock and USB did not breach the indenture agreement, we need not address their alternative argument that Bremer failed as a matter of law to establish damages.  Accordingly, the judgment of the district court is affirmed.