# United States Bankruptcy Appellate Panel
## FOR THE EIGHTH CIRCUIT

_____

No. 12-6025

_____

In re:                                          *
                                                *
Racing Services, Inc.,                          *
                                                *
        Debtor.                                 *
                                                *
                                                *
Kip M. Kaler, as Bankruptcy Trustee    *    Appeal from the United States
for Racing Services, Inc.,             *    Bankruptcy Court for the
                                       *    District of North Dakota
        Plaintiff - Appellee,          *
                                       *
        v.                             *
                                       *
Susan Bala,                            *
                                       *
        Defendant - Appellant.         *
                                       *

_____

Submitted: October 23, 2012
Filed: November 29, 2012

_____

Before FEDERMAN, VENTERS, and SALADINO, Bankruptcy Judges.

_____

SALADINO, Bankruptcy Judge.

Susan Bala appeals the bankruptcy court's[1] summary judgment determination that the bankruptcy estate is entitled to the cash value proceeds of a life insurance policy the Debtor had obtained for Bala during her employment. For the reasons stated below, we affirm.

## STANDARD OF REVIEW

We review a bankruptcy court's grant of summary judgment *de novo, Mwesigwa v. DAP, Inc.*, 637 F.3d 884, 887 (8th Cir. 2011) (citing *Anderson v. Durham D & M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010)). When an appellate court reviews a trial court's entry of summary judgment *de novo*, it uses the same standard applied by the trial court pursuant to Federal Rule of Civil Procedure 56(c). *Bremer Bank v. John Hancock Life Ins. Co.*, 601 F.3d 824, 829 (8th Cir. 2010). Under Rule 56(c), summary judgment is proper if the pleadings, affidavits, and other evidence show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056.

A trial court's interpretation of a contract is also reviewed *de novo*. *Bremer Bank*, 601 F.3d at 829 (*citing Transcon. Ins. Co. v. W.G. Samuels Co.,* 370 F.3d 755, 757(8th Cir. 2004)). Further, under North Dakota law, construction of a written contract to determine its legal effect presents a question of law fully reviewable by the appellate court, which independently examines and construes the contract to determine whether the trial court erred in its interpretation. *Bendish v. Castillo*, 812 N.W.2d 398, 403 (N.D. 2012).

---

[1]The Honorable Thad J. Collins, United States Bankruptcy Judge for the Northern District of Iowa, sitting by designation in the District of North Dakota.

## BACKGROUND

The material facts are undisputed. Susan Bala is a former employee and the sole stockholder of RSI Holdings. RSI Holdings is the sole stockholder of the Debtor, Racing Services, Inc. ("RSI"). RSI is a Delaware corporation that provided licensed pari-mutuel services in North Dakota.

On March 27, 1995, The Guardian Life Insurance Company of America issued a "Whole Life Policy" on Bala's life. Bala was the listed owner of the policy at the time it was created and at all times pertinent to this litigation. On May 16, 1995, approximately two months after the policy was issued, Bala executed a "Majority Shareholder Collateral Assignment (Split Dollar)" agreement in connection with the policy. Under the Collateral Assignment, Bala owned the policy, the premiums were paid by RSI, and Bala's estate was listed as the beneficiary.

The Collateral Assignment provides in pertinent part:

> 1. The undersigned [Bala] (herein called "Assignor") hereby assigns, transfers and sets over to RACING SERVICES, INC. of Fargo, ND (herein called "Assignee") to the extent of the total of any and all amounts heretofore or hereafter advanced by the Assignee to the Assignor for the payment of premiums or a portion of the premiums (herein called "Assignee's Interest") thereon, Policy No #3909537 issued by The Company indicated above (herein called "Insurer") . . . upon the life of Susan Bala subject to all the terms and conditions of the Policy . . . . The Assignor by this instrument agrees and the Assignee by the acceptance of the assignment agrees to the conditions and provisions herein set forth.

3

2. It is expressly agreed that only the following specific rights are included in this assignment and pass by virtue hereof to the Assignee and may be exercised solely by the Assignee:

   a. The right to obtain, upon surrender of the policy by the Assignor, an amount of the cash surrender proceeds up to the amount of the Assignee's interest in the policy.

   b. The right to collect the net proceeds of the policy when it becomes a claim by death or maturity up to the amount of the Assignee's Interest.

3. The Assignee accepts this assignment and agrees that as long as this assignment is in force, the Assignee will advance to the Assignor each year as the premium on the Policy becomes due, the Assignee's Payment . . . .

. . .

8. If this agreement is terminated, the Assignee shall transfer its interest in the Policy to the Assignor in exchange for an amount equal to the Assignee's Interest, obtained by the Assignee upon the security of the policy.

Between May 1995 and June 2004 (when the bankruptcy trustee was appointed), RSI paid the monthly premiums due under the policy in the total amount of $70,765.92. From July 2004 through November 2006, the premiums were paid under the policy's Automatic Premium Loan Provision which provided that "any unpaid premium will be paid at the end of the grace period by an automatic loan if this option was elected in the application," and "the premium does not exceed the available loan value." Payment of the premiums under this provision decreased the policy's cash surrender value.

RSI filed a voluntary Chapter 11 bankruptcy petition on February 3, 2004, in the United States Bankruptcy Court for the District of Delaware. On February 12,

2004, the case was transferred to the United States Bankruptcy Court for the District of North Dakota. On June 15, 2004, RSI's bankruptcy case was converted from Chapter 11 to Chapter 7, and Kip Kaler was appointed as the Chapter 7 trustee.

As a result of a federal investigation, in February 2005 Bala and RSI were convicted of, among other crimes, conducting and conspiring to conduct an illegal gambling business. Forfeiture judgments were entered against Bala and RSI in the amount of $19,000,000.00 and $99,000,000.00, respectively. The Eighth Circuit Court of Appeals, however, reversed on all counts, concluding there was insufficient evidence of guilt.[2]

In the roughly two years between the convictions and the Eighth Circuit's reversal, several events concerning the policy took place. In September 2006, the United States Attorney for the District of North Dakota filed a Motion for Forfeiture of Property in the criminal action in the United States District Court for the District of North Dakota.[3] The motion sought forfeiture of Bala's remaining asset – the cash surrender value of the policy. The district court granted the motion on October 25, 2006, and ordered that Bala's interest in the policy be forfeited to the United States.

Kaler, as trustee of RSI's bankruptcy estate, claimed an interest in the policy pursuant to the Collateral Assignment that he asserted was superior to the interest of the United States under the forfeiture order. Then, on January 26, 2007, the trustee entered into a settlement agreement with the United States Attorney's Office under the terms of which (i) the United States agreed to cancel the policy or withdraw its cash value, "whichever is greater"; (ii) the trustee would release to the United States any claim to one-half of the net proceeds; and (iii) the United States or the clerk of the court would hold the proceeds pending the outcome of the criminal appeal. The

---

[2] *See United States v. Bala, et. al.*, 489 F.3d 334 (8th Cir. 2007).

[3] Case No. 3:03-cr-112.

agreement was subject to bankruptcy court approval which was never obtained.[4] Notwithstanding the lack of bankruptcy court approval, on February 8, 2007, Guardian delivered a check for $64,032.33 – identified as the "net surrender value" of Bala's interest in the policy at that time – to the United States Department of Justice.[5] At the same time, Guardian also sent a letter to Bala stating that the policy had been "surrendered" and giving instructions on what to do if she wanted to reinstate the policy.

On February 23, 2007, another order was entered in the criminal case. The district court found that Bala might not have received proper notice of the Motion for Forfeiture of Property and ordered that any attempt to liquidate the life insurance asset cease immediately and any proceeds already received be held pending a mandate from the Court of Appeals. That order, however, came too late to prevent the liquidation of the policy – the surrender value had already been sent to the Department of Justice. No action was taken by Bala, Guardian, or the Department of Justice to reverse the surrender of the policy at that time.

In July 2007, four months after Bala's conviction was reversed, the Department of Justice returned the $64,032.33 check to Guardian. Guardian then notified Bala of the terms and conditions under which the policy surrender could be reversed and the policy reinstated. Specifically, Guardian directed Bala to submit a reinstatement application (which evidently required proof of insurability) and to pay the overdue premium from November 2006 through August 2007 (plus loan interest) in the total

---

[4]The trustee did file a motion for approval in the bankruptcy case and Bala objected. However, the trustee later withdrew the motion for approval.

[5]Guardian's cover letter indicated it was sending the money pursuant to the forfeiture order. It is unclear how Guardian became aware of the forfeiture order or whether the United States Department of Justice had taken action under the settlement agreement.

amount of $6,074.01. Bala did not respond to Guardian's July 18, 2007, letter, nor did she challenge any of Guardian's conditions for reinstatement, submit a reinstatement application, or remit the overdue premiums and loan interest.

In January 2009, Guardian filed a Motion for Interpleader Relief in the underlying bankruptcy. Bala resisted, but on April 27, 2009, the bankruptcy court granted the motion and Guardian was directed to deliver the cash surrender value of the policy to the trustee to be held in an interest-bearing bank account. The court noted the funds would be subject to disbursement only upon further order of the court. The order further provided: "Upon the delivery of its check for $64,032.33 to Mr. Kaler . . . Guardian Policy No. 3909537 is and shall forever be CANCELED and SURRENDERED, and no further death or cash surrender proceeds thereunder shall be payable . . . ." The order also provided that upon delivery of the funds, "Guardian is fully and completely released of any and all liability and claims arising from or related to any obligation to pay the death or cash surrender proceeds under [the policy]."

On January 24, 2011, the trustee filed the underlying adversary proceeding seeking a determination that the cash surrender value of the policy is an asset of the RSI bankruptcy estate. Bala filed a counterclaim which specifically acknowledged that Guardian had "surrendered" the policy and asserted a claim to the cash proceeds as the owner of the policy. Subsequently, the trustee filed a Renewed Motion for Summary Judgment.[6] Bala responded to the motion and filed her own Renewed Cross-Motion for Summary Judgment. The bankruptcy court issued its decision granting judgment for the trustee on April 13, 2012.

---

[6] It was called a "renewed" motion because an earlier motion had been denied by the court.

7

The bankruptcy court agreed with Bala that the bankruptcy estate did not have an interest in the cash surrender value of the policy under paragraph 2(a) of the Collateral Assignment because the triggering event under that paragraph – a surrender of the policy by Bala – never happened. However, the bankruptcy court concluded that pursuant to paragraph 8, the estate was entitled to the cash surrender value (to the extent of the premiums it had paid) upon termination of the Collateral Assignment. It further held that the Collateral Assignment terminated when the trustee stopped paying premiums or, alternatively, when the bankruptcy court's April 27, 2009, order deemed the policy "CANCELED and SURRENDERED." Specifically, the bankruptcy court held:

> Two separate events proved to be a "termination" of the agreement. First, RSI's failure to pay the premium would be a breach of the Collateral Assignment, thus terminating the Assignment (and triggering Clause 8). The language of the Assignment reveals an intent to treat a breach as a termination under Clause 8. Bala agrees that RSI failed to continue payment of the Policy premiums but argues that was a breach of the Collateral Assignment which "was rendered unenforceable and nullified by the RSI Estate." (Bala B.R., ECF Doc. No. 30, at 3.) Bala cites no language in the Policy or Collateral Assignment that supports her argument that failure to pay the premium nullified the Collateral Assignment.
>
> Second, even were the Court to conclude that this failure by RSI to make payment did not terminate the Collateral Assignment, the Collateral Assignment and Policy were certainly terminated by the Court's April 27, 2009 Order. That order specifically canceled and required surrender of the Policy, and directed Guardian to deposit the cash surrender value with Trustee. Prior to that point, Bala had the option to cure the surrender by submitting a

8

reinstatement application and remitting overdue premium and loan interest. Her failure to make these payments could be viewed as further evidence of termination. At a minimum, this Court's Order served as the "termination" that triggered Clause 8 of the Collateral Assignment.

The Court thus concludes, under Clause 8, the Collateral Assignment was terminated by Judge Hill's April 27, 2009 Order in the underlying Bankruptcy. At that time RSI should have transferred its interest in the Policy to Bala in exchange for an amount equal to RSI's interest in the Policy – the cash surrender value. Consequently, RSI's bankruptcy estate, and not Bala, is entitled to the cash surrender value of the Policy under Clause 8 of the Collateral Assignment.

Bala timely appealed, asserting that the bankruptcy court erred in granting summary judgment for the trustee and denying her cross-motion for summary judgment.

## DISCUSSION

Bala argues that the assignee's (and therefore, the trustee's) rights in the policy are governed and limited by the express terms of the Collateral Assignment. We agree. While paragraph 1 of the Collateral Assignment is a broad assignment of her rights in the policy, paragraph 2 places clear limitations on the extent of the assignment: "It is expressly agreed that *only* the following specific rights are included in this assignment and pass by virtue hereof to the Assignee . . . ." (emphasis added). Paragraph 2 then goes on to describe the rights given to the assignee – the assignee is given the right to receive the "cash surrender proceeds"

up to the amount of the assignee's interest (the premiums paid to date by the assignee) upon "surrender of the policy by the Assignor."[7]

Bala vehemently denies that she ever surrendered the policy and, therefore, she believes the triggering event for the RSI bankruptcy estate to have an interest in the surrender value never took place. We disagree. Bala's argument ignores the specific language and effect of the district court's October 25, 2006, forfeiture order. Pursuant to the forfeiture order, "Defendant Bala's interest in Life Insurance Policy Number 3909537, The Guardian Life Insurance Company of America, is forfeited to the United States . . . ." The order also allowed the Attorney General of the United States to seize the policy and to "maintain custody and control" of it. Thus, Bala did not even have the right to request surrender of the policy during the period of time that the forfeiture was in effect – all of her rights in the policy belonged to the United States, at least until the district court judge issued his February 23, 2007, order staying the forfeiture order. *U.S. v. Timley*, 507 F.3d 1125, 1130 (8th Cir. 2007) (holding that title and ownership of forfeited property vests in the United States at the time the defendant's criminal act occurred).

As it turns out, the policy was "surrendered" while the forfeiture order was in effect as Guardian sent the "surrender" value to the United States on February 8, 2007, with a letter referencing the forfeiture order. Guardian's action in treating the forfeiture as a surrender is consistent with the policy language. At page 7, the policy clearly provides three methods by which the owner can take the policy value when premium payment has been discontinued – (i) continue the policy as "non-participating paid up extended term insurance;" (ii) continue the policy as "participating paid up insurance;" or (iii) surrender the policy for its cash surrender

---

[7]The assignee is also given the right to collect the net proceeds of the policy when it becomes a claim by death or maturity up to the amount of the premiums paid. Bala is not deceased and the policy has not matured, so this provision does not apply.

value. It is undisputed that the policy has not continued in any form and Guardian treated the forfeiture order as a "surrender for cash" by the owner.[8] Under those circumstances, and under the plain language of paragraph 2(a) of the Collateral Assignment, the assignee is entitled to the cash surrender value up to the amount of the premiums paid. "An insurance contract, like any other contract, is to be construed according to the sense or meaning of the words that are used in the contract." *Andersen v. Standard Life & Acc. Ins. Co.*, 149 N.W.2d 378, 380 (N.D. 1967) (citing *Schmitt v. Paramount Fire Ins. Co.*, 92 N.W.2d 177 (N.D. 1958)). Accordingly, Bala's argument – that the estate's right to receive its interest under paragraph 2 of the Collateral Assignment never arose because Bala never surrendered the policy – is simply incorrect.[9]

Bala also argues that the bankruptcy trustee breached the terms of the Collateral Assignment by failing to pay the premiums and engaged in deliberate efforts to cancel the insurance policy and, therefore, should not be allowed to claim greater rights in the cash value for the estate than the estate would have had if the policy had not been "wrongfully" canceled. Those arguments fail for several reasons.

---

[8]Bala seems to believe it is significant under paragraph 2 of the Collateral Assignment that Guardian seemed to cause the surrender on the basis of the forfeiture order rather than on her personal request to surrender. We do not agree. We believe that Guardian's treatment of the policy as surrendered due to the forfeiture of Bala's rights in the order obtained by the United States is substantively the same as a surrender by Bala herself.

[9]Bala's reliance on *Badami v. Sears (In re AFY, Inc.)*. 461 B.R. 541, 548 (B.A.P. 8th Cir. 2012) is also misplaced. There, the split-dollar agreement was found to be an executory contract because the owner had not performed his obligation to assign the insurance policy and the corporation had not performed its obligation to pay the premiums. Here, Bala *has* assigned the policy and the only unperformed obligation appears to be on the part of RSI.

11

First, they are based on the premise that the policy surrender or termination by Guardian was "wrongful." Again, the surrender came at a time when the United States, and not Bala herself, held all of Bala's interest in the policy pursuant to the specific terms of the forfeiture order. Bala did not have any right to object to the surrender or otherwise exercise any interest in the policy while the forfeiture order was in effect. As it turned out, the district court later found that Bala may not have had proper notice of the forfeiture motion, but that does not cause Guardian's surrender of the policy proceeds to the United States based on the forfeiture order to be an improper or wrongful act by the trustee.

Second, after her conviction was overturned and Guardian gave her the option to reinstate the policy, Bala failed to take any action to do so. Granted, Guardian wanted her to pay the past-due premiums, but it expressly acknowledged that the premiums could be paid by the automatic premium loan provisions. Guardian also wanted her to submit a reinstatement application that she says would have required proof of insurability. Bala did not question or otherwise take any action to challenge that requirement by Guardian.

Finally, and in any event, Bala acknowledges several times in her briefs and filings that the policy has "terminated."[10] The bankruptcy court held that termination of the policy resulted in a "termination" of the Collateral Assignment under clause 8. While we do not necessarily agree that a termination of the policy automatically results in a termination of the Collateral Assignment, we do recognize that Bala assigned the policy to RSI and, therefore, must take steps to terminate the Collateral Assignment in order to be entitled to any of the cash surrender value upon termination of the policy. In other words, despite acknowledging that the policy was

---

[10]In fact, the underlying adversary proceeding is solely for the purpose of determining who is entitled to the surrender proceeds – Bala or the RSI bankruptcy estate; not to determine whether the surrender or termination was proper.

12

surrendered and has terminated, Bala fails to recognize that her rights in the surrender value have been assigned under the Collateral Assignment. If she wants to terminate the Collateral Assignment, paragraph 8 expressly provides that she must repay the premiums advanced by RSI. She has not done so. "We may affirm the bankruptcy court's order on any basis supported by the record, even if that ground was not considered by the trial court." *Bryan v. Stanton (In re Bryan)*, 466 B.R. 460, 465 (B.A.P. 8th Cir. 2012).

## CONCLUSION

For the reasons stated above, we affirm.

_____