In re FARRELL & HOWARD
AUCTIONEERS, INC.,
Debtor.

Richard P. SALEM, Trustee, Plaintiff,

v.

LAWRENCE LYNCH CORP., Defendant.

Bankruptcy No. 92–40142JFQ.

Adv. No. 94–4054.

United States Bankruptcy Court,
D. Massachusetts.

Oct. 13, 1994.

Richard P. Salem, Trustee, Leicester, MA.

Dennis F. Gorman, Fletcher, Tilton & Whipple, Worcester, MA, for Lawrence Lynch Corp.

### OPINION

JAMES F. QUEENAN, Jr., Chief Judge.

This is a preference case brought by the chapter 7 trustee of Farrell & Howard Auctioneers, Inc. (the "Debtor"), a licensed auc-

tioneer. Among the defenses of Lawrence Lynch Corp. (the "Defendant") is the contention that the payment in question came not from funds of the Debtor but rather from either the Defendant's funds or funds of others whose property the Debtor had sold. I reject that contention. This decision will therefore do much to resolve the ownership issues which dominate other pending preference actions and control distribution of the entire bankruptcy estate.

Richard P. Salem (the "Trustee") seeks to avoid as preferential a payment of $10,971.00 made by the Debtor to the Defendant on October 28, 1991. The Defendant moves for summary judgment. For the reasons set forth below, the motion is denied.

## I. FACTS

In reciting the facts, I draw in part from the Trustee's report which sets forth the Debtor's business and banking operations. The facts disclosed in the report are not disputed. The report was filed at the request of the court in an attempt to make headway in tracing net sales proceeds. As shall be seen, such tracing will not be necessary.

The Debtor was in the business of auctioning industrial equipment and other personal property. On August 20, 1991, the Debtor and the Defendant signed an agreement for the auction of certain items of the Defendant's equipment. The agreement was made on the Debtor's printed form. It states the Defendant "employs" the Debtor at an 8% commission to sell the equipment at an auction scheduled for September 12, 1991. The Defendant agreed to "sell the ... equipment to the highest bidder ... and to deliver said equipment to the purchaser by Bill of Sale free of all encumbrances" and "to provide insurance for fire, theft, collision, personal liability, etc.".

Significantly, the agreement contains no provision requiring the Debtor to segregate the equipment's sales proceeds from funds of the Debtor or others. Nor does it contain any statement that the Debtor was to hold the proceeds in trust. The only provision concerning the sales proceeds reads as follows: "Net proceeds less commission to be paid to seller by [Debtor] 14 banking days from date of sale."

On September 12th, the Debtor sold the equipment at public auction for $11,925. The price was paid in checks payable to the Debtor. The Debtor maintained two checking accounts. It used one for payroll only. The other was used for general operations, into which the Debtor deposited all receipts, including auction proceeds. The Debtor paid from this account all its expenses and sums due property owners for net auction proceeds, after deduction of its commission. The Debtor deposited into its general checking account the $11,925 received from the sale of the Defendant's equipment. On October 28, 1991, it drew a $10,971 check on the account payable to the Defendant, the payment now in question. Under the terms of the parties' agreement, the payment had become due the end of September.

On January 17, 1992, the Debtor filed a chapter 11 petition with this court. The case was converted to chapter 7 on February 4, 1992. Thereafter, the Trustee was appointed interim trustee. On March 16, 1992 he became permanent trustee as the result of creditors declining to hold an election of a trustee.

The Trustee commenced this adversary proceeding on January 18, 1994, two years and a day following the initial filing of the chapter 11 case.

## II. STATUTE OF LIMITATIONS

The Defendant contends that this adversary proceeding was commenced after the statute of limitations had expired. Section 546(a) of the Code, as it is about to be amended, would support the Defendant. The amendment would bar an avoidance action commenced after the later of "(A) 2 years after the entry of the order for relief; or (B) 1 year after the appointment or election of the first trustee under section 702, 1104, 1163, 1202, or 1302 of this title...." As of this writing, the amendment has been passed by both houses, but has not yet been signed by the president. See H.R. 5116, 103d Cong., 2d Sess. (1994). The amendment does not apply, however, to an adver-

sary proceeding such as this commenced before the date of its enactment. *Id.,* § 702.

Section 546(a) of the Code now provides in pertinent part:

> An action or proceeding under section ... 547 ... may not be commenced after the earlier of—
>
> (1) two years after the appointment of a trustee under section 702, 1104, 1163, 1302, or 1202 of this title; or
>
> (2) the time the case is closed or dismissed.

The "appointment of a trustee under section 702" took place in this case on March 16, 1992, when the Trustee's status changed from "interim trustee" to "trustee." The present action having been commenced on January 18, 1994, it would seem to be clear from section 546(a) that suit was brought well within its two year limitation period. Many courts have so held.[1]

Other courts disagree. The question typically arises in a chapter 11 case where no trustee is appointed. Many cases commenced under chapter 11 never have a trustee appointed, whether under chapter 11 (§ 1104), under chapter 7 (§ 702) or under any of the other statutes referred to in section 546(a). If a chapter 11 case continues with the debtor in possession, this would mean, under a literal reading of section 546(a), there is no limitation period for avoidance actions in these cases until the case is closed. Not willing to tolerate that void, and

finding no rationale for a distinction between debtors in possession and trustees, some courts find a bar date. They read "appointment of a trustee" to refer to the debtor's filing of its chapter 11 petition, so that the bar date falls two years thereafter.[2] They do so because they regard a debtor in possession as equivalent to a trustee in chapter 11 on the ground a debtor in possession has essentially the same rights, powers, functions and duties of a trustee appointed under section 1104.[3] Observing that all courts read "appointment of a trustee" to include an elected trustee under section 702 in a chapter 7 case, they reject as too literal the decisions that stop the ticking of the clock only at case closing.

Courts making this interpretation of section 546(a) do violence to the statute's language. The "appointment of a trustee" surely means something other than the voluntary filing of a chapter 11 petition. If this is not plain, the additional words "under section ... 1104" remove any possible doubt. Section 1104 is the section which authorizes a court to appoint a chapter 11 trustee. Moreover, the other interpretation leaves unanswered what happens in a case such as the present one where a trustee has been appointed following an initial chapter 11 filing. Having two limitation periods in these cases is not very tidy.

■ Reading the statute literally, as I do, means there is no bar date for commence-

1. *See, e.g., Maurice Sporting Goods, Inc. v. Maxway (In re Maxway Corp.),* 27 F.3d 980 (4th Cir.1994); *Crumley v. Tomen America, Inc. (In re National Steel Serv. Ctr., Inc.),* 170 B.R. 745 (Bankr.N.D.Ga.1994); *Bonwit Teller, Inc. v. Jewelmasters, Inc. (In re Hooker Invs., Inc.),* 162 B.R. 426 (Bankr.S.D.N.Y.1993); *Official Unsecured Creditors' Committee v. Leviton Mfg. Co., Inv. (In re Electrical Materials Co.),* 160 B.R. 1018 (Bankr.W.D.Mo.1993); *Brin–Mont Chemicals, Inc. v. Worth Chemical Corp. (In re Brin–Mont Chemicals, Inc.),* 154 B.R. 903 (M.D.N.C.1993); *Saccurato v. Shawmut Bank (In re Mars Stores, Inc.),* 150 B.R. 869 (Bankr.D.Mass.1993); *Cardullo v. Dwyer Mechanical Corp. (In re Cardullo),* 142 B.R. 138 (Bankr.E.D.Va.1992); *Freedom Ford, Inc. v. Sun Bank & Trust Co. (In re Freedom Ford, Inc.),* 140 B.R. 585 (Bankr.M.D.Fla.1992); *In re Allegheny Int'l, Inc.,* 136 B.R. 396 (Bankr. W.D.Pa.1991); *Pullman Constr. Indus, Inc. v. Nat'l Steel Serv. Ctr. (In re Pullman Constr. Indus, Inc.),* 132 B.R. 359 (Bankr.N.D.Ill.1991).

2. *U.S. Brass & Copper Co. v. Caplan (In re Century Brass Prods, Inc.),* 22 F.3d 37 (2d Cir.1994); *Construction Management Servs., Inc. v. Manufacturers Hanover Trust Co. (In re Coastal Group, Inc.),* 13 F.3d 81 (3d Cir.1994); *Upgrade Corp. v. Government Technology Servs., Inc. (In re Softwaire Ctr. Int'l, Inc.),* 994 F.2d 682 (9th Cir. 1993); *Zilkha Energy Co. v. Leighton,* 920 F.2d 1520 (10th Cir.1990); *Harstad v. Egan & Sons Co. (In re Harstad),* 170 B.R. 666 (D.Minn.1994); *Sparmal Enters., Inc. v. Moffit Realty Corp. (In re Sparmal Enters., Inc.),* 126 B.R. 559 (S.D.Ind. 1991).

3. *Id.* See section 1104, which provides, subject to certain limitations, conditions and exceptions, that debtor in possession has "all the rights ... and powers, and shall perform all the functions and duties ... of a trustee serving in a case under this title." 11 U.S.C. § 1107 (1988).

ment avoidance actions, other than the date the case is closed, when the debtor serves as debtor in possession. That may not be desirable. Although the court should not delay closing a confirmed case solely because payments remain to be completed under the plan,[4] cases can stay open as long as something remains on the court's docket. On the other hand, deferring the bar date to the date of case closing may make sense in many instances. A debtor in possession will often want to delay bringing avoidance actions until after confirmation. In that way the debtor devotes its energies to negotiating and confirming the plan, and avoids alienating creditors during the process. The counter-arguments to this are: (i) under the other interpretation the debtor has two full years to confirm a plan without involvement in preference actions, and (ii) the debtor must disclose its intention to bring preference actions after confirmation. But the wisdom of the statute is beside the point. Congress made its decision in words too plain for misunderstanding. Its mandate must be followed.

### III. *ABSENCE OF TRUST FUNDS*

█ The Defendant's other argument raises an issue which transcends this case and applies to other pending preference actions. The Defendant contends the funds used for its payment were not property of the Debtor, but were rather sales proceeds belonging either solely to the Defendant or jointly to

the Defendant and others whose property the Debtor had sold. In order for a transfer to be preferential, the transfer must of course be "of an interest of the debtor in property."[5] And, with respect to the rights of other sellers remaining unpaid, it is true that the bankruptcy estate does not include any property in which the Debtor did not hold an equitable interest.[6] The Debtor nevertheless had an equitable interest in the funds constituting the payment here. Let me explain.

The parties' agreement was a consignment to the Debtor rather than a sale, and the Trustee does not contend otherwise. Under the agreement, the Defendant "employs" the Debtor. The Defendant, not the Debtor, was charged with delivery of a bill of sale to the auction buyer and with the responsibility of insuring the property in the interim. The agreement contained no fixed price. These terms are indicia of a consignment, not a sale.[7] The prime feature distinguishing consignment from sale is the absence in a consignment of an obligation to pay for the goods on the part of the party to whom they are delivered.[8] The Debtor had no obligation to pay if it did not sell the equipment. Upon sale, its sole obligation was to pay the Defendant the "[n]et proceeds less commission." A consignment, therefore, took place.[9]

On this much the Trustee and Defendant seem to agree. They part company, however, concerning ownership of the proceeds. The Defendant asserts that the Defendant's

---

4. 11 U.S.C. § 350 (1988) (court required to close case only after "estate is fully administered and the court has discharged the trustee"); Fed. R.Bankr.P. 3022 and Advisory Committee Notes to 1991 amendments.

5. 11 U.S.C. § 547(b) (1988).

6. 11 U.S.C. § 541(d) (1988).

7. *E.g., Ludvigh v. American Woolen Co.,* 231 U.S. 522, 34 S.Ct. 161, 58 L.Ed. 345 (1913); *Ray v. Maguire (In re D.I.A. Sales Corp.),* 339 F.2d 175 (6th Cir.1964); *Nathanson v. Worcester Bank & Trust Co.,* 73 F.2d 889 (1st Cir.1934); *In re Prager,* 173 F.Supp. 859 (D.N.H.1958). *Compare, Osborn v. Ketcham & Rothschild, Inc. (In re Renfro–Wadenstein),* 47 F.2d 238 (D.C.W.D.Wash.1931), *modified on other grounds,* 53 F.2d 834 (9th Cir.1931) (arrangement deemed conditional sale, void for lack of recording,

where fixed price was to be paid by "consignee", and "consignor" had right to terminate and require payment).

8. *Fowler v. Pennsylvania Tire Co.,* 326 F.2d 526 (5th Cir.1964).

9. This does not necessarily mean the bankruptcy estate would have no rights in any consigned goods remaining unsold at the petition filing date. Because no U.C.C. filing was made, and Massachusetts has no sign law for consignors, the equipment would be "deemed to be on sale or return" unless it is established the Debtor was "generally known by [its] creditor to be substantially engaged in selling goods of others." Mass. Gen.L. ch. 106, § 2–326 (1984). If there was no such general knowledge (presumably there was), the Trustee could assert rights of creditors through his strong arm powers under section 544(a) of the Bankruptcy Code.

continued ownership of the equipment up to the auction sale necessarily means it owned the sales proceeds, so that at most there is a tracing problem. I disagree.

The wording of the contract, as well as the Debtor's actions, are conclusive on ownership of the sales proceeds. The contract imposed no obligation to segregate the proceeds or hold them in trust. It merely required the Debtor to pay the Defendant the net proceeds, less commission, within fourteen business days following the auction. Consistent with these terms, the Debtor deposited the proceeds in its general operating account, intermingling them with other sales proceeds and drawing checks upon the account for the Debtor's expenses and payments to other sellers. All of this, particularly the agreement's terms, establishes that the parties' relationship following the auction was that of debtor and creditor rather than trustee and beneficiary.[10] That is so even though the arrangement with the property prior to sale was a consignment.[11]

Some of the case law, although not inconsistent with this conclusion, is a bit confusing on the point. Without stressing the importance of a contractual requirement for segregation of the funds, courts have ruled that proceeds from the sale of consigned goods are held in trust for the consignor, subject to the consignor's ability to trace its specific sales proceeds.[12] In these cases, however, the parties' contract required the segregation of sales proceeds.[13] Other decisions granting the consignor rights in proceeds (subject to its ability to trace the proceeds) do not disclose whether the parties' agreement required the sales proceeds to be kept separate from the consignee's other funds.[14]

I receive guidance from cases of bankrupt department stores involving claims of department lessees to proceeds received by the debtor from the sales of the lessees' merchandise. The lease in such cases usually states that all proceeds are to be held "in trust" by the debtor department store. However, the lease permits the debtor to use the funds between settlement dates and commingle them with its own funds. As a result, courts have held that only a debtor-creditor relationship existed between the parties.[15]

The Defendant relies upon two decisions of other bankruptcy judges in this district. Neither has application to the facts here. *Shipley Co., Inc. v. Darr (In re Tap, Inc.)*[16] involved a debtor who made out payroll checks for its customers and assisted them in paying payroll taxes. A customer sought to recover a tax check that remained with the debtor at the time of the filing. The customer had delivered the check to the debtor and the debtor had deposited it in its account used for the payment of such taxes. In these circumstances, the fiduciary nature of the relationship was obvious, and the court so ruled.

The Defendant also cites *Branch v. Hill, Holliday, Connors, Cosmopoulos, Inc. Ad-*

10. *In re Warner–Quinlan Co.*, 86 F.2d 103 (2d Cir.1936).

11. *Id.*

12. E.g., *Chenault v. Baar*, 54 F.2d 921 (5th Cir. 1932) (tracing impossible under circumstances); *Ginsburg v. Mears (In re J.M. Acheson Co.)*, 170 F. 427 (9th Cir.1909) (case remanded for evidence on tracing); *John Deere Plow Co. v. McDavid (In re John Deere Plow Co.)*, 137 F. 802 (8th Cir.1905) (tracing impossible under circumstances).

13. *Id.*

14. E.g., *In re Wood*, 283 F. 565 (D.C.N.H.1922).

15. E.g., *Evans Fur Co., Inc. v. Chase Manhattan Bank (In re Sakowitz)*, 949 F.2d 178 (5th Cir. 1991); *Carlson, Inc. v. Commercial Discount*

Corp., 382 F.2d 903 (10th Cir.1967); *Chicago Cutter–Karcher, Inc. v. Maley (In re Lord's, Inc.)*, 356 F.2d 456 (7th Cir.1966); *Mendel v. Whitmer (In re Yeager Co.)*, 315 F.2d 864 (6th Cir.1963); *Leased Pet Dept's., Inc. v. Cook United, Inc. (In re Cook United, Inc.)*, 50 B.R. 559 (Bankr.N.D.Ohio 1985). See also *Pan Am. World Airways, Inc. v. Shulman Transp. Enters., Inc. (In re Shulman Transp. Enters., Inc.)*, 744 F.2d 293 (2d Cir.1984) (debtor freight forwarder did not hold funds received from customers in trust for carrier where debtor arranged shipment on carrier and received a commission from the rate charged); *Delta Pride Catfish, Inc. v. Marine Midland Business Loans, Inc.*, 767 F.Supp. 951 (E.D.Ark.1991) (debtor truck hauler did not hold proceeds received from shippers in trust for hauler where debtor collected proceeds and was entitled to commission thereon).

16. 52 B.R. 271 (Bankr.D.Mass.1985).

*vertising (In re Bank of New England Corp.).*[17] The debtor there was a bank holding company which received funds monthly from its subsidiaries for the purpose of paying advertising expenses of the subsidiaries. The funds were held in an unrestricted account, but were used only for the payment of expenses of the subsidiaries, which included the allegedly preferential payment in question. The funds received and paid out passed through the debtor without any profit to it. Stopping short of ruling the funds were held in trust, the court held the funds never became property of the debtor. Those facts are also distinguishable. Unlike in *Bank of New England,* the Debtor here deducted a commission from the funds and used the account for its own general corporate purposes.

The facts in the present case are somewhat analogous to those before the First Circuit in *In re Morales Travel Agency.*[18] The debtor there, a travel agency, sold airline tickets to its customers. An airline claimed to be the owner of the proceeds from the Debtor's sales of tickets for its flights. The parties' agreement stated the ticket sales proceeds would be the "property" of the airline and would be held by the debtor "in trust" for the airline. There was no requirement, however, that the ticket proceeds be held in an account separate from other funds, and it was the agency's practice to commingle all its funds in one account. The court held a debtor-creditor relationship was created. It relied upon the decisions involving department stores in which department lessees were denied an ownership interest in proceeds from the sales of their goods because of the debtor's freedom to use the proceeds for its own purposes and commingle them with its funds.[19] Despite the trust language of the

agreement, the court believed a debtor-creditor relationship existed because there was no requirement that the debtor keep the funds separate and otherwise unrestricted. That is our situation here. And here, unlike in *Morales,* the agreement makes no attempt to impose a trust upon the funds.[20]

The Defendant also seeks support from the decision of the Supreme Court in *Begier v. Internal Revenue Service.*[21] In that case, a bankruptcy trustee sought to avoid as preferential a debtor's payments to the Internal Revenue Service of income and social security taxes the debtor was required to withhold or collect from its employees. The payments having been made from the debtor's general operating account, the trustee contended they came from property of the debtor. The Court disagreed. It relied upon the withholding tax statute, which provides: "Whenever any person is required to collect or withhold any internal revenue tax from any other person and to pay over such tax to the United States, the amount of the tax so collected or withheld shall be held to be a special fund in trust for the United States."[22] The Court read this as creating a trust at the time employees are paid, even though there is no fund segregated for the taxes.[23] The decision thus involved a trust fund declared to exist by federal statute. In the present case, not even the parties' contract declares a trust to exist. Indeed, the contract indicates the opposite.

## IV. EXCEPTION FOR ORDINARY COURSE PAYMENTS

The Defendant also contends the payment in question is protected as a transfer in the ordinary course of business under section 547(c)(2). The affidavit submitted by the Defendant, however, asserts none of the

---

**17.** 165 B.R. 972 (Bankr.D.Mass.1994).

**18.** 667 F.2d 1069 (1st Cir.1981).

**19.** *Id.* at 1072.

**20.** *Morales,* on the other hand, involved a factor not present here which gave further support to the court's ruling no trust was created. The court stated its conclusion was "buttressed" by the existence of the debtor's responsibility to pay the carrier the price of tickets sold whether or

not the Debtor's customers paid it. *Morales* at 1072.

**21.** 496 U.S. 53, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990).

**22.** 26 U.S.C. § 7501 (1988).

**23.** The Court also held the usual tracing rules did not apply because section 7501 creates a trust in an abstract amount not tied to any particular assets. *Id.* at 2267.

facts required for this defense to apply. The evidence may or may not support the Defendant on the point. The payment was due, under the parties contract, by the end of September, but was made on October 28th. Nonetheless, this does not necessarily mean the payment falls outside section 547(c)(2). That all depends upon the Debtor's business practices and those of the auction industry generally. It also depends upon whether the Defendant exerted any extraordinary efforts to collect the payment.

## V. *CONCLUSION*

A separate order has issued denying the Defendant's motion for summary judgment and setting down a pretrial date.