# United States Bankruptcy Appellate Panel
## FOR THE EIGHTH CIRCUIT

_____

Nos. 11-6045/6046/6047/6048/6049/11-6050/6051

_____

In re:  LGI Energy Solutions, Inc;          *
    LGI Data Solutions Company, LLC    *
                                               *

      Debtors                         *

John R. Stoebner, Trustee          *    Appeal from the United States
                                               *    Bankruptcy Court for the
    Plaintiff - Appellant             *    District of Minnesota

          v.                           *

Consumers Energy Company;          *
Potomac Electric Power Company;    *
Alabama Power Company;             *
Atlantic City Electric Company;    *
East Cedarbrook Plaza, LLC;        *
Florida Power & Light Company;     *
Gulf Power Company;                *

    Defendants - Appellees            *

_____

Submitted:  October 31, 2011
Filed: December 8, 2011

_____

Before FEDERMAN, VENTERS, and NAIL, Bankruptcy Judges

FEDERMAN, Bankruptcy Judge

The Plaintiff-Appellant in these related appeals is the Trustee in the Chapter 7 bankruptcy cases of LGI Energy Solutions, Inc., and LGI Data Solutions Company LLC, which were in the business of providing utility-management and billing services to restaurants and other customers. As such, they collected from their customers funds for payment of the customers' utility bills, and were in turn to pay those funds on to the utilities. Due to volume, they were also able to obtain discounts from some utilities, and were paid a percentage of such discounts in addition to a monthly fee. This consolidated appeal involves seven adversary proceedings by the Trustee to avoid payments made by Debtor LGI Energy to the Defendant utilities prior to the bankruptcy. The Trustee contends that such payments were preferential and/or fraudulent transfers under the Bankruptcy Code and applicable state law. The Bankruptcy Court granted summary judgment in favor of the Defendants, based on its conclusion that the payments they received for the utilities were not an asset of either Debtor. The Trustee appeals, and we reverse and remand.

## FACTUAL BACKGROUND

The parties agree that all payments at issue came from an account at U.S. Bank ending in 3321 ("the 3321 Account"). That account was held in the name of "LGI Energy Solutions, Inc.," without reference to its being held for any particular purpose or for the benefit of any other party. The Defendants contend in effect that the 3321 Account was a funnel through which the customers paid their utility bills, and that LGI Energy typically paid those bills within hours or at most two days after receipt of payment from its customers. Indeed, LGI Energy's agreements with at least some of its customers provided, in somewhat different variations, that LGI Energy was to acquire no ownership in the payments from the customers as they passed through LGI Energy.[1] For purposes of this appeal, the Trustee agrees that funds paid by customers

---

[1] For example, Paragraph 3(b) of the Energy Services Agreement between LGI Energy and Buffets, Inc. provided that "At no time shall LGI have a legal or

2

to LGI Energy were required by agreement with the customers to be held pursuant to a trust or trust-like relationship, and that such funds were to only be used to pay that customer's bills.

However, in the period prior to its bankruptcy, the Trustee contends that Debtor LGI Energy did not treat its customers' funds consistent with its contractual obligations to them. According to the Trustee, the Debtors' principal was siphoning money out of the Debtors and then engineered a Ponzi and check kiting scheme to conceal the thefts and induce customers to keep advancing money. The Trustee contends that the Debtors also shuffled money around from account to account. Eventually, there was not enough money to pay the utilities. The Trustee asserts that LGI Energy was commingling the payments from the utility clients with other income from their servicing and leasing operations, and perhaps with loan funds from a bank.

More specifically, the Trustee's Complaints against the seven Defendants identified a total of 59 transfers made to the Defendants via check from the 3321 Account, which were negotiated between November 10, 2008 and November 26, 2008.[2] The last deposit into this account by any of the customers of these Defendants occurred on November 4, 2008. None of the checks at issue here was negotiated by the Defendant-payees before November 10, 2008. There appears to be no dispute that the balance of the 3321 Account was frequently reduced to zero or overdrawn between the dates of the deposits of the customers' alleged trust money and the dates when funds were transferred to the Defendants in payment of utility bills.

---

equitable interest in the Customers Funds and Customer grants no security interest to LGI."

[2] A transfer made by check is deemed to occur when the check is honored, not when written or when the payee receives it. *See, e.g., In re Pyatt*, 486 F.3d 423, 427 (8th Cir. 2007) (*citing Barnhill v. Johnson*, 503 U.S. 393, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992)).

3

For example, according to the Trustee, the account balance at the end of November 4, 2008 – after customer Buffets, Inc. deposited the amount of $208,567.28 for the payment of its utility bill – was just $1.22. Yet the utility bill for which Buffets had made its deposit on that day had not yet been paid at that point. According to the Trustee, Buffets' money obviously went somewhere else, and someone else's money was used to later pay Buffets' utility bill.

In the three weeks after November 4, 2008, the 3321 Account was almost perpetually overdrawn, including on the last business day, November 7, before the first of the checks to Defendants was negotiated. The Trustee asserts that, after November 4, 2008, every other deposit into the 3321 Account was from a source other than the customers at issue here. Some deposits were from a different customer not implicated in these adversary proceedings, and some were from other accounts belonging to the Debtors, and not from those customers. The Defendants do not dispute that funds were commingled and that the dollars used to pay their respective utility bills were not necessarily the same dollars paid by the customer whose bill was being paid. In other words, the Defendants concede that they cannot trace the money directly from the customer to the payment of that customer's utility bills. Rather, as discussed more fully below, the Defendants assert that, so long as they show that a customer's "trust" money went into the account, they need not trace those funds on to the Defendants.

The Bankruptcy Court essentially agreed. It held that in order for the Defendants to prevail based on the argument that funds paid to them were never property of the Debtors, the Defendants were not required to show that the funds they received were the funds paid by their utility users to LGI Energy. Such tracing might be required, the Court held, if the Debtor was still holding funds which competing parties contended were held in trust for them. However, the Court further held, no such tracing is required where the Debtor has already made payments which it was obligated to make, regardless whose money was used to make them.

4

As discussed more fully below, we hold that that ruling is inconsistent with Minnesota law and Eighth Circuit precedent. If a trust or agency relationship was intended to be created by the agreements between LGI Energy and its customers, then the Defendants were nevertheless required to prove that LGI Energy honored that relationship and treated the funds accordingly. In other words, they had to trace the money. For that reason, we reverse and remand for further findings.

## STANDARD OF REVIEW

We review findings of fact for clear error, and legal conclusions de novo.[3] The Bankruptcy Court's grant of summary judgment is reviewed de novo.[4] Summary judgment is appropriate if, viewing the evidence in the light most favorable to the nonmoving party, there is no material factual dispute, and the movant is entitled to judgment as a matter of law.[5] "To create a genuine issue of material fact – at trial or on appeal – a nonmoving party (or appellant) must set forth specific facts and present affirmative evidence showing there is a genuine issue of material fact precluding summary judgment."[6]

---

[3] *See In re Waterman*, 248 B.R. 567, 570 (B.A.P. 8th Cir. 2000).

[4] *See U.S. v. Horras* (*In re Horras*), 443 B.R. 159, 161–62 (B.A.P. 8th Cir. 2011) (*citing Taylor v. St. Louis County Bd. of Election Comm'rs*, 625 F.3d 1025, 1028 (8th Cir. 2010)).

[5] Fed. R. Civ. P. 56(c); *Bremer Bank v. John Hancock Life Ins. Co.*, 601 F.3d 824, 829 (8th Cir. 2010).

[6] *In re Horras*, 443 B.R. at 167 (*citing* Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)).

DISCUSSION

## *Property of the Debtor*

Count I of the Trustee's Complaint sought to avoid the transfers as preferences under 11 U.S.C. § 547. Section 547(b) provides that a trustee "may avoid any transfer *of an interest of the debtor in property*" to or for the benefit of a creditor, on account of an antecedent debt, while the debtor was insolvent, on or within 90 days before the filing of the petition, and that enables such creditor to receive more than such creditor would receive if the case were a case under chapter 7 and the transfer had not been made.[7] The theories relied on by the Trustee in the other counts of the Complaint, for avoidance of fraudulent transfers under 11 U.S.C. § 548 and Minnesota law, similarly require proof that the Debtor held an interest in the property transferred.[8]

Significantly, we note at this point that the Bankruptcy Code provides that preferences and fraudulent transfers may be recovered either from the recipient of the payment, or from the creditor (here, the customers) for whose benefit the payment was made.[9] Consequently, the Trustee could have sued either the Defendants or the customers whose utility bills were paid.

---

[7] 11 U.S.C. § 547(b) (emphasis added).

[8] 11 U.S.C. §§ 548(a)(1) and 544(a). The Trustee's Complaint also asserted a Count IV which was an objection to the Defendants' claims. Because the Defendants had not filed claims in the case by the time of the hearing on the Motion for Summary Judgment, the Bankruptcy Court dismissed Court IV as moot. The Trustee does not appeal from that part of the Judgment.

[9] 11 U.S.C. § 550(a)(1). While the Bankruptcy Court held that the Defendant utilities are creditors of the Debtor, the payments to them could in any event be avoidable as payments for the benefit of the customers, who are creditors.

The Bankruptcy Code does not define "interest of the debtor in property" before a bankruptcy is filed. However, in *Begier v. Internal Revenue Service,* the Supreme Court held that that term is "best understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings."[10] Section 541 of the Bankruptcy Code provides, as relevant here, that the estate is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case . . . ."[11] While bankruptcy law determines whether an asset is property of the estate, the existence and extent of property is defined by state law.[12] Under Minnesota law, funds held in a bank account are presumed to belong to the account holder.[13] Courts have, however, held that in certain circumstances, such presumption can be rebutted, as will be shown.

In *Begier,* the Supreme Court held that taxes withheld from employee paychecks, commonly referred to as "trust fund taxes," which were paid by the debtor to the IRS could not be the subject of a preference avoidance because they were never "property of the debtor" under § 547. It held that, because a debtor does not own an equitable interest in property he holds in trust for another, that interest is not "property of the estate," nor is such an equitable interest "property of the debtor" for purposes of § 547(b).[14]

---

[10] 496 U.S. 53, 58, 110 S.Ct 2258, 2263, 110 L.Ed.2d 46 (1990).

[11] 11 U.S.C. § 541(a)(2).

[12] *See In re N.S. Garrott & Sons*, 772 F.2d 462, 466 (8th Cir. 1985).

[13] *See In re Estate of Whish*, 622 N.W.2d 847, 850 (Minn. App. 2001). *See also* 5 Collier on Bankruptcy ¶ 541.08 (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2011) ("Deposits in the debtor's bank account become property of the estate under § 541(a)(1)").

[14] *Begier*, 496 U.S. at 2263.

As distinguished from the contractual trust which may have been created by LGI's agreements with its customers here, the Court in *Begier* emphasized that the Internal Revenue Code expressly provides that trust fund taxes are, by statute, held in trust by the employer. The trustee in *Begier* argued that the trust funds lost their trust status when they were put into, and transferred out of, the debtor's general operating accounts.

In rejecting the trustee's argument in *Begier*, the Supreme Court said:

In the absence of specific statutory guidance on how we are to determine whether the assets transferred to the IRS were trust property, we might naturally begin with the common-law rules that have been created to answer such questions about other varieties of trusts. Unfortunately, such rules are of limited utility in the context of the trust created by § 7501 [of the Internal Revenue Code]. Under common-law principles, a trust is created *in property*; a trust therefore does not come into existence until the settlor identifies an ascertainable interest in property to be the trust res. A § 7501 trust is radically different from the common-law paradigm, however. That provision states that "the *amount* of [trust-fund] tax ... collected or withheld shall be held to be a special fund in trust for the United States." Unlike a common-law trust, in which the settlor sets aside particular *property* as the trust res, § 7501 creates a trust in an abstract "amount" – a dollar *figure* not tied to any particular assets – rather than in the actual dollars withheld. Common-law tracing rules, designed for a system in which particular property is identified as the trust res, are thus unhelpful in this special context.[15]

Thus, because of the express language of the Internal Revenue Code, the Supreme Court held that it did not matter that the trust fund taxes had been commingled, since that statutory trust is not created in a *res*. But where, as here, a debtor's obligations as to the use of funds are not imposed by statute, a trust is only created as to those

_____

[15] *Id.* at 2265 (citations omitted; emphasis added by *Begier* Court).

assets which constitute its *res*.[16]  In that situation, the Supreme Court directed courts making this analysis to apply "reasonable assumptions" to govern the tracing of funds.[17]

Similarly, under Minnesota law, tracing would be required for the Defendants to establish that the funds were held pursuant to an express trust.  Indeed, the Defendants concede that under Minnesota law, an express trust cannot exist unless there is "a definite trust *res* wherein the trustee's title and estate is separated from the vested beneficial interest of the beneficiary . . . ."[18]  Similarly, applying Minnesota law, the Eighth Circuit has held that a constructive trust may not be imposed unless the claimant can identify specify property to which such trust would attach.[19]

In *MJK Clearing, Inc.,* the plaintiff had deposited cash with the debtor to be used as collateral for the purchase of stock.  In seeking to latch onto funds held by the debtor in a commingled account at the time of its bankruptcy, the plaintiff asked for imposition of a constructive trust.  The Eighth Circuit held that, in order to impose such a trust, tracing was required.[20]  Significantly, the plaintiff in *MJK Clearing* asked

---

[16]  *Id.*

[17]  *Id.* at 2267.

[18]  *Principal Brief of Respondents* [*Defendants-Appellees*] at 26 (*citing In re Bush's Trust*, 249 Minn. 36, 81 N.W.2d 615 (1957)).

[19]  *In re MJK Clearing, Inc.,* 371 F.3d 397, 401 (8th Cir. 2004).

[20]  *Id.* ("A constructive trust may be imposed only when there is some specific property identified as belonging, in equity and conscience, to the plaintiff. . . . A constructive trust does not arise unless there is property on which the trust can be fastened, and the property is held by the person to be charged as constructive trustee.") (*quoting Rock v. Hennepin Broad. Assocs*., 359 N.W.2d 735, 739 (Minn. Ct. App. 1984) (requiring "clear and convincing evidence" before imposing constructive trust)).

the Eighth Circuit to apply the Supreme Court's decision in *Begier* to determine that the trust was created at the inception, and that tracing rules did not apply. The Eighth Circuit rejected that argument, holding that tracing is required in the absence of a statutory trust. Thus, it held, "like a common-law trust, a constructive trust creates a trust in specific property, not an amorphous 'amount.'"[21]

The Eighth Circuit further held that the "lowest intermediate balance" test should be applied to trace assets in an account.[22] The lowest intermediate balance test has also long been used to apply tracing rules in Minnesota,[23] and we have previously said that that test applies to trace money when a preference defendant asserts a constructive trust as a defense.[24] Under that test, "a court follows the trust fund to and decrees restitution from an account where the amount on deposit has at all times since the commingling of the funds equaled or exceeded the amount of the trust fund."[25] "However, if the account is depleted after the trust fund has been deposited, the trust

---

[21] *Id*. at 402.

[22] *Id.* at 401.

[23] *See Bishop v. Mahoney* (*In re Irish-American Bank*)*,* 70 Minn. 238, 240-41 (1897) (holding that a trust fund may be recovered even if it does not appear that the identical money of the trust fund is in a commingled account if there has always remained on hand a balance of the mixture equal to the amount of the trust fund which originally entered into the mixture; but, if at any time the balance has been reduced to a less amount, then the trust may recover out of the mixture an amount equal to the smallest balance which has remained on hand since the moneys were commingled).

[24] *See Ramette v. Digital River, Inc.* (*In re Graphics Technology, Inc.*), 306 B.R. 630 (B.A.P. 8th Cir. 2004).

[25] *In re MJK Clearing*, 371 F.3d at 402 (citation and internal quotation marks omitted).

fund is treated as lost."[26] In *MJK Clearing*, because the particular account into which the plaintiff's money went dipped to zero, the Eighth Circuit held that the plaintiff could not trace its money, and the trustee prevailed.[27]

The Defendants rely on a Sixth Circuit decision, *In re Computrex, Inc.*, for the proposition that no tracing is required here.[28] They argue on appeal that the Bankruptcy Court itself relied on *Computrex* in holding that the funds paid to it were not property of the estate. While the Court's ruling contains no such reference, we nevertheless consider *Computrex* because it is the leading case adopting the Defendants' position here.

In that case, Contech Construction Products, Inc., a manufacturer of metal and plastic pipe, engaged the debtor, Computrex, to assist it with the processing and payment of Contech's freight charges. As set forth in the agreement between the two parties, Computrex, after receiving bills from the carriers, would process the bills and send a compiled invoice to Contech at the end of each week. Contech wired the funds to Computrex, who was then supposed to pay the freight carriers the following day. Computrex started having cash flow problems, so it developed a "float" system whereby, in violation of the agreement with Contech (and its other clients), it would hold onto the wired funds for increasing periods of time so that it could earn interest off the money, rather than paying the carriers immediately. Eventually, when it did not have enough money in the account to pay all of the clients' carriers, it started paying the carriers of the clients who complained ahead of carriers of other clients in the queue. Contech complained, so its carriers were paid significant amounts of

---

[26] *Id.* (*citing First Fed. of Mich. v. Barrow*, 878 F.2d 912, 915 (6th Cir. 1989); *In re United States Cigar Stores Co. of Am.*, 70 F.2d 313, 316 (2d Cir. 1934)).

[27] *Id.* at 403.

[28] 403 F.3d 807 (6th Cir. 2005), *reh'g en banc denied* Sept. 9, 2005.

11

money, whereas other clients' carriers were not paid before an involuntary bankruptcy was filed against Computrex. Clearly, as is the case here, because Computrex paid all the carriers from one account containing commingled funds, it had used money from other clients to pay Contech's carriers.

The Sixth Circuit determined that the agreement between the parties required Computrex to hold such funds, in effect, as a "disbursing agent," and that the relationship was essentially the same as a bailment.[29] Under that theory, the Sixth Circuit held that the money never became property of the debtor, even though it had been commingled. We do not consider that to be a correct interpretation of bailment law under Eighth Circuit and Minnesota law.

The general concept of a bailment is fairly universal:

> A "bailment" in its ordinary legal sense imports the delivery of personal property by the bailor to the bailee who keeps the property in trust for a specific purpose, with a contract, express or implied, that the trust shall be faithfully executed, and the property returned or duly accounted for when the special purpose is accomplished or that the property shall be kept until the bailor reclaims it.[30]

---

[29] *Id.* at 812.

[30] *Lackawanna Chapter of Ry. & Locomotive Historical Soc'y, Inc. v. St. Louis County, Missouri*, 497 F.3d 832, 837 (8th Cir. 2007) (referring to Missouri's definition of bailment as the "traditional concept.") (citations omitted). *See also* 8 *C.J.S. Bailments* § 18 ("Although variously stated from jurisdiction to jurisdiction, the basic elements of a bailment are the delivery of personal property from one person to another for a specific purpose, the acceptance by the transferee of such delivery, an agreement that the purpose will be fulfilled, and an understanding that the property will be returned to the transferor or dealt with as the transferor directs.").

Similarly, in Minnesota, "[a] bailment occurs when property is delivered to a party, without ownership being transferred, under an agreement that the property will be returned."[31]

Although bailment is most typically thought of in the context of personal property or chattels – such as a car, for example – the concept has been held to include other types of property, including money, as the Court in *Computrex* stated. By its nature, the analysis of bailment of money is more complicated than that involving a car, for example. Either way, however, one of the core principles of a bailment is that the bailee holds specific and identifiable property for the bailor. "[I]f either by contract or otherwise, there is no obligation to restore the specific property, and the bailee is at liberty to return another thing of equal value or the money value the transaction is not a bailment."[32] One treatise has described the bailment of money as follows:

> While the parties to a bailment of money have the right and authority to change their relation, by a later contract, to that of debtor and creditor as parties to a loan, a bailment of money is not converted into a loan by reason of the mere fact that the bailee is not able to return the identical currency or specie deposited with him or her. Whether one who transfers money to another should be considered a bailor or a creditor turns on the intent of the parties to the transaction, as manifested by their conduct and statements and any other relevant evidence. *A bailment of money is created when a special or specific bank account is created, title to the funds remains with the account holder, and the funds are separated from other deposits.*[33]

---

[31] *Leighton v. Rossow*, 2010 WL 772341 at *4 (Minn. App. 2010) (not reported) (*citing Wallinga v. Johnson*, 269 Minn. 436, 438, 131 N.W.2d 216, 218 (1964)).

[32] 8 *C.J.S. Bailments* § 7

[33] *Id.* (citations omitted; emphasis added).

13

Similarly, Minnesota courts have held that "[w]here money paid to another is not required to be segregated by the payee and held as a separate fund for the benefit of the payor, there is no trust."[34]  And, in the context of bank accounts, "[w]here the depositor of cash consents to commingling it with other funds of the depositee, the relationship resulting from the transaction is not that of trustee and beneficiary, even though the deposit is for the latter's benefit, but that of debtor and creditor."[35] "[W]here the money is kept intact the transaction is a bailment."[36]  Money deposited in a bank to be commingled with its other funds loses its identity and the depositor ceases to be the owner of the deposit, even if the deposit is to be used for the benefit of the depositor.[37]

Even the case cited by *Computrex* for the proposition that money may be the subject of a bailment emphasized that such bailment requires that the money not be commingled.  That case, *Hargis v. Spencer*,[38] involved a bag of gold coins.  The alleged bailor argued that the alleged bailee had commingled the coins by placing the bag in the same trunk with her own money, and, therefore, she was *ipso facto* liable for conversion of the coins.  The Court in that case expressly disagreed, finding no evidence that the bailee had mixed the coins, noting that she could have returned the very same bag of coins to the bailor.[39]  In other words, the bailment had not been violated because there had been no commingling.  This is consistent with the general

---

[34]  *Farmers State Bank of Fosston v. Sig Ellingson & Co.*, 16 N.W.2d 319, 323 (Minn. 1944).

[35]  *Id.* at 324.

[36]  *Id.* (citing *Furber v. Barnes*, 32 Minn. 105, 19 N.W. 728 (1884)).

[37]  *Id.*

[38] 71 S.W.2d 666 (Ky. App. 1934).

[39]  *Id.* at 669.

14

concept that bailment involve specific and identifiable property which can be returned to the bailor.

Nevertheless, *Computrex* further stated that "[t]he fact that a bailee, which has a possessory interest in the property entrusted to him, but no legal or equitable interest, may commingle the funds his clients entrust to him does not give the bailee any property interest in the funds."[40] However, the case it cites for that proposition, *In re Crouthamel Potato Chip Co.*,[41] involved the bailment of equipment, and commingling was not an issue.

As the Trustee further points out, *Computrex*'s viability even in the Sixth Circuit is in some question. First, the Sixth Circuit reached the opposite result in another case, *First Federal of Michigan v. Barrow.*[42] In that case, the debtors were engaged in the business of mortgage investments. Pursuant to loan servicing agreements with their clients, the debtors collected mortgage payments, deposited them into segregated escrow accounts, and made disbursements to the client's lender, taxing authority, and insurance carrier. At one point, however, the debtors stopped segregating the money, and instead commingled the clients' funds in one account. When cash flow became a problem, the debtor began favoring some creditors by paying them first out of the commingled funds. When the bankruptcy trustee sued those creditors for recovery of the payments, they asserted that the payments were not property of the debtor because they were held in a constructive trust. They specifically argued that tracing was not necessary. The Sixth Circuit expressly rejected that argument, holding that "[i]t is beyond peradventure that, as a general rule, any party seeking to impress a trust upon funds for purposes of exemption from

---

[40] 403 F.3d at 812.

[41] 6 B.R. 501, 507 (Bankr. E.D. Pa. 1980).

[42] 878 F.2d 912 (6ᵗʰ Cir. 1989).

a bankrupt estate must identify the trust fund in its original or substituted form."[43] The Sixth Circuit further held that, because the defendants had not traced their funds beyond the deposits into the commingled account, they could not prevail:

> In the instant case, [defendants] have not attempted to trace their funds beyond the deposits into the commingled Salem Central Account, which evidence, standing alone, is insufficient to support their constructive trust theory of recovery. Since the purported constructive trust consisted of money, which had no extrinsic identifiable characteristics of its own, that was initially deposited and commingled into the Salem Depository Account with unidentifiable funds received from innumerable and diverse other sources and daily redeposited and again commingled in the negative balance Salem Central Account, [defendants'] funds irretrievably lost their identity and "tracing" became a futile pursuit as a result of which the controversial payments here in issue became avoidable transfers within the meaning of 11 U.S.C. § 547(b) and 550(a).[44]

Although the Sixth Circuit later came to a different result in *Computrex*, the *Computrex* Court did not mention *First Federal v. Barrow* at all.

More recently, in *In re R.W. Leet Electric*,[45] a Sixth Circuit BAP decision, the Chapter 7 trustee sought to avoid preferences that the electrical-contractor debtor made to its supplier on various construction projects. In that case, a statute provided for the creation of a trust in money received by a contractor that is owed to its subcontractors. The Sixth Circuit BAP held that, even though the debtor had been holding funds in trust for the subcontractor, "it must be established that the payments

---

[43] *Id.* at 915.

[44] *Id.* at 915-16.

[45] *Meoli v. Kendall Electric, Inc.* (*In re R.W. Leet Electric, Inc.*), 372 B.R. 846 (B.A.P. 6th Cir. 2007).

actually paid to [the subcontractor] are traceable to the trust funds received by the Debtor."[46]  The BAP distinguished *Begier*'s ultimate holding because that case involved a specific statute that created the trust in an amount of money withheld from employee paychecks, rather than a *res*.  Instead, it held, under Sixth Circuit law, including *Barrow*, courts universally agree that the trust beneficiary must be able to trace the funds.[47]  Further, "if an interest of the debtor in property means property that would become property of the estate had the transfer not occurred, . . . then it is irrelevant whether the transfer was pre or postpetition."[48]  The BAP in *R.W. Leet Electric* did not discuss *Computrex*.

The Defendants also rely on *Daly v. Deptula* (*In re Carrozzella & Richardson*),[49] which held that, in contrast to the typical situation where the plaintiff is the trust beneficiary suing the defendant-trustee to recover funds in trust, in the unique posture of bankruptcy preference litigation, only the *deposited* trust funds must be traced – a preference defendant need not trace their funds because, when the debtor (as trustee of the trust) transferred funds back to the defendants on request, the debtor has essentially "traced" the funds for the defendants.  However, in order to reach that conclusion, the bankruptcy court expressly declined to follow the Second Circuit BAP's direction in a prior decision in a related case that tracing was required.[50]

---

[46]  *Id.* at 853 (citing *Begier*).

[47]  *Id.* at 853-54.

[48]  *Id.* at 854 (citations and internal brackets omitted).

[49] 255 B.R. 267 (Bankr. D. Conn. 2000).

[50]  *Daly v. Radulesco* (*In re Carrozzella & Richardson*), 247 B.R. 595 (B.A.P. 2d Cir. 2000).

In sum, we do not view *Computrex*'s or the bankruptcy court's holding in *Carrozzella* – that tracing is not required when trust funds are commingled – as being consistent with Eighth Circuit precedent or Minnesota law. Indeed, in *MJK Clearing*, the Eighth Circuit relied on the Sixth Circuit's contrary decision in *Barrow* in its holding that, if the commingled account is depleted after the trust fund has been deposited, "the trust fund is treated as lost."[51]

The Eighth Circuit has further held that, in addition to the agreement between the parties, a party asserting that commingled funds were held pursuant to an agency relationship must also demonstrate that the holder of such funds in fact honored that relationship. In *In re Rine & Rine Auctioneers*,[52] the debtor was an auction company. It auctioned off certain property owned by an entity named Huddle. The auctioned property was collateral for a loan by Huddle to a Bank. The debtor sold the property and deposited the proceeds into its general bank account, commingled with other funds. It then paid some of the proceeds to Huddle, and some to the Bank in satisfaction of its security interest. When the auction company filed bankruptcy, the trustee sought to recover the payments to Huddle and the Bank as preferences. The bankruptcy court had held that the Debtor and Huddle were in an agent-principal relationship, and not a debtor-creditor relationship, and that the money was therefore, at all times, Huddle's. In reversing, the Eighth Circuit agreed that, as a general rule, if property is in the debtor's hands as agent, the property or proceeds therefrom are not treated as property of the debtor's estate. However, the Court stated that "[t]he wording of the contract, as well as the Debtor's actions, are conclusive on ownership of the sales proceeds."[53]

---

[51] 371 F.3d at 402.

[52] *Rine & Rine Auctioneers, Inc. v. Douglas County Bank & Trust Co.* (*In re Rine & Rine Auctioneers, Inc.*)*,* 74 F.3d 854 (8th Cir. 1996).

[53] *Id*. at 861 (*quoting Salem v. Lawrence Lynch Corp. (In re Farrell & Howard Auctioneers, Inc.,* 172 B.R. 712, 716 (Bankr. D. Mass. 1994)).

In *Rine,* despite the wording of the contract, the Eighth Circuit considered the following factors to show that the money was the debtor's property, and was not held by it as Huddle's agent: (1) the sale proceeds were deposited into the debtor's general bank account, which lacked any idicia of Huddle's ownership, (2) the proceeds were commingled with other funds in the debtor's possession and control; (3) the general bank account had a negative balance on several occasions; (4) the money paid to Huddle could not have been the actual proceeds from the sale of Huddle's property – in other words, the funds could not be traced; (5) the debtor bore the risk of loss if the successful bidders failed to pay for assets they purchased; (6) the debtor "was engaging in a distinct occupation, unsupervised by Huddle and entirely independent of Huddle's business"; (7) the account was subject to any claims by the debtor's creditors; and (8) Huddle exercised no control over Debtor's conduct with respect to the auction proceeds.[54]

Although some of the factors applied in *Rine* came from Nebraska agency law, these factors may be helpful in determining whether, the language of the agreements notwithstanding, the actions of the parties in this case resulted in LGI Energy acquiring an ownership interest over the customers' payments.

The Eighth Circuit commented in *Rine* that "a major goal of the Bankruptcy Code is to treat equal classes of creditors equally" and that one of the tools for doing that is the preference statute.[55] In other words, the preference and fraudulent transfer provisions of the Bankruptcy Code are intended to equalize the playing field when a debtor is in trouble by preventing the strongest and fastest creditors from getting all

---

[54] *Id.* at 858-59.

[55] *Id.* at 860 (citation omitted).

the money.[56] The *Computrex* case is an example of why this principle should likewise apply to require tracing when a preference defendant asserts a trust or bailment exists: Contech's purported trust money was commingled with similarly-situated bailors' money, yet Contech's creditors got paid from the commingled funds because it complained the loudest, to the detriment of the other purported bailors. Indeed, as the Sixth Circuit BAP recognized in *In re R.W. Leet Electric*: "Without a tracing requirement, insolvent trustees who have converted trust assets for their own use would be able to choose, on the eve of bankruptcy, who is to be repaid and who is not. Thus, similarly situated creditors would receive disparate treatment."[57]

## *Fraudulent Transfers*

Although the Bankruptcy Court's grant of summary judgment in favor of the Defendants on all of the preference and fraudulent transfer counts was based on the threshold determination that the payments were not the Debtors' property, the Bankruptcy Court also appears to have held, as to the fraudulent transfer counts, that the Debtors received reasonably equivalent value for the payments and that the transfers to the Defendants were not made with any intent to hinder, delay, or defraud creditors. Because the Bankruptcy Court did not make sufficient factual findings upon which we could address these issues, we leave them to the Bankruptcy Court to consider as appropriate on remand.[58]

---

[56] At oral argument, the Defendants' counsel argued social policy, contending in effect that such Defendants should not be made to repay a preference since they did not choose to extend credit to the Debtors. We note, however, that the same was true for the bank defendant in *Rine*, which had received auction proceeds from an auctioneer hired not by the bank, but by its customer.

[57] 372 B.R. at 855 (citation omitted).

[58] *See Rine*, 74 F.3d at 863 n. 7.

## CONCLUSION

For the foregoing reasons, the Orders Granting Summary Judgment in favor of the Defendants are REVERSED and REMANDED. On remand, the Bankruptcy Court should determine whether the contracts between LGI Energy and its customers created a trust relationship or bailment, and whether LGI Energy honored that relationship in its treatment of the customers' funds, as well as any remaining factual disputes between the parties.

---